UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROSALIE LOLONGA-GEDEON,

|  |  |  |
|---|---|---|
|  | Plaintiff, | REPORT |
| v. |  | and |
|  |  | RECOMMENDATION |

CHILD & FAMILY SERVICES,                                   08-CV-00300A(F)

                                      Defendant.
_____

APPEARANCES:          SANDERS & SANDERS
                                   Attorneys for Plaintiff
                                   HARVEY P. SANDERS, of Counsel
                                   401 Maryvale Drive
                                   Cheektowaga, New York  14225

                                   HODGSON RUSS LLP
                                   Attorneys for Defendant
                                   ADAM W. PERRY,
                                   JOSHUA ISAAC FEINSTEIN, and
                                   JEFFREY THOMAS FIUT, of Counsel
                                   The Guaranty Building, Suite 100
                                   140 Pearl Street
                                   Buffalo, New York  14202-4040


## **JURISDICTION**

This case was referred to the undersigned by Honorable Richard J. Arcara on

July 25, 2008 for pretrial matters including preparation of a report and recommendation

on dispositive motions.  The matter is presently before the court on Defendant Child &

Family Services motion filed May 24, 2013 (Doc. No. 187), for summary judgment.

## BACKGROUND

On April 18, 2008, Plaintiff Rosalie Lolonga-Gedeon ("Lolonga" or "Plaintiff"),

then proceeding *pro se*, commenced action alleging employment discrimination by her

former employer, Child & Family Services ("CFS" or "Defendant"), who harassed and

retaliated against Plaintiff, and eventually terminated Plaintiff's employment based on

Plaintiff's race, color, sex, and national origin.  Plaintiff's claims are asserted under Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and New York

State Human Right Law, N.Y. Exec. Law § 290 *et seq.* ("HRL").  On July 23, 2008,

Defendant filed an answer (Doc. No. 5).  On November 20, 2012, Harvey P. Sanders,

Esq., filed a notice of appearance on Plaintiff's behalf.

On May 24, 2013, Defendant filed the instant motion (Doc. No. 187)

("Defendant's Motion"), seeking summary judgment, and supported by the attached

Declaration of Joshua Feinstein, Esq. in Support of Motion for Summary Judgment

(Doc. No. 187-1) ("Feinstein Declaration"), attaching exhibits A through G (Docs. Nos.

187-2 through 187-8) ("Feinstein Dec. Exh(s). __"), the Declaration of Julie Loesch in

Support of Summary Judgment (Doc. No. 187-9) ("Loesch Declaration"), attaching

exhibits A through I (Docs. Nos. 187-10 through 187-18) ("Loesch Dec. Exh(s). __"), the

Declaration of Collette Griffin Romano in Support of Summary Judgment (Doc. No. 187-

19) ("Romano Declaration"), attaching exhibits A through R (Docs. Nos. 187-20 through

187-37) ("Romano Dec. Exh(s). __"), the Memorandum of Law in Support of

Defendant's Motion for Summary Judgment (Doc. No. 187-38) ("Defendant's

Memorandum"), and Defendant's Statement of Undisputed Facts Pursuant to Local

Rule 56) (Doc. No. 187-39) ("Defendant's Statement of Facts").  On August 21, 2013,

Plaintiff filed the Declaration of Rosalie Lolonga-Gedeon in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 191) ("Plaintiff's Declaration"), attaching exhibits 1 through 7 (Doc. No. 191-1), and separately filed exhibits 8 through 15 (Doc. No. 192-1), exhibits 16 through 23 (Doc. No. 193), and exhibits 24 through 31 (Doc. No. 194) ("Plaintiff's Exh(s). __"), the Declaration of Harvey P. Sanders, Esq. in Opposition to Defendant's Summary Judgment Motion (Doc. No. 195) ("Sanders's Declaration"), attaching exhibit 1 (Doc. No. 195-1) ("Sanders's Dec. Exh. 1"), Plaintiff's Statement of Facts in Dispute Pursuant to Local Rule 56 (Doc. No. 196) ("Plaintiff's Statement of Facts"), and Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 197) ("Plaintiff's Memorandum").  On October 4, 2013, Defendant filed the Reply Memorandum of Law in Support of Defendant's Motion for Summary Judgment (Doc. No. 200) ("Defendant's Reply"), attaching the Reply Declaration of Joshua Feinstein, Esq., in Support of Summary Judgment (Doc. No. 200-1) ("Feinstein Reply Declaration"), with exhibit A (Doc. No. 200-2) ("Feinstein Reply Dec. Exh. A"), and the Reply Declaration of Collette Griffin Romano in Support of Summary Judgment (Doc. No. 200-3) ("Romano Reply Declaration"), with exhibits A and B (Docs. Nos. 200-4 and 200-5) ("Romano Reply Dec. Exh(s). __").  Oral argument was deemed unnecessary.

Based on the following, Defendant's Motion seeking summary judgment should be DENIED as to Plaintiff's disparate treatment claim based on Plaintiff's race, color, and national origin, DENIED as to Plaintiff's retaliation claim; DENIED as to Plaintiff's hostile environment claim; and GRANTED as to Plaintiff's state law claim.

# FACTS[1]

Plaintiff Rosalie Lolonga-Gedeon ("Plaintiff" or "Lolonga"), a woman of African descent, was born in Zaire, now known as the Democratic Republic of the Congo. Plaintiff's native language, with which Plaintiff is most fluent, is French, and Plaintiff speaks English with an accent.  Plaintiff moved to the United States and attended Corning Community College from which Plaintiff received an Associate's degree in paralegal studies in 2001.  Plaintiff then enrolled in a legal studies program with the University of Wolverhampton ("the University"), United Kingdom, from which Plaintiff anticipated receiving a Bachelor of Law degree ("Bachelor's degree" or "LL.B."), in May 2005.

In December 2003, Plaintiff commenced employment with the Better Business Bureau's Dispute Settlement Center ("the Center"), located in Jamestown, New York, as a Dispute Resolution Specialist responsible for coordinating the Center's Community Dispute Resolution Program ("CDRP") in the Chautauqua County region.  The Center was a court and community-based mediation program, and had three permanent staff members including Plaintiff, Program Coordinator Michelle Tarbox ("Tarbox"), and Dispute Resolution Case Manager Kristen Wright ("Wright").  At that time the Center for Resolution and Justice ("CRJ"), operated a similar court and community-based mediation program in the eight counties comprising Western New York, assisting predominantly low-income litigants with a variety of issues including neighbor disputes, child custody, visitation, small claims, landlord-tenant, and special education entitlements, so as to reduce the New York State court system's caseload.  From 1998

---

[1] Taken from the pleadings and motion papers filed in this action.

until January 2005, one Julie Roesch ("Roesch"), served as the CRJ's Executive Director.

In January 2005, the BBB lost their contract for providing the CDRP to CFS, which then began operating CRJ out of the same office as the CDRP, eliminating one of the CDRP's three positions, including Plaintiff's Dispute Resolution Specialist position, and reconfiguring the remaining two positions and their associated duties into Site Supervisor – Jamestown ("Site Supervisor"), and Senior Case Manager/Settlement Conference Facilitator ("Senior Case Manager") positions for which the former CDRP employees were encouraged to apply, but were not automatically, hired.  Plaintiff and Wright applied for both positions.

According to the job postings, the stated qualifications included a "Bachelor's degree and one to two years of related experience and/or training or equivalent combination of education and experience" for the Site Supervisor position, Site Supervisor Job Posting,[2] and a "Juris Doctorate (J.D.) from an accredited law school with one to two years experience and/or training in the area Family Law; or equivalent combination of education and experience," for the Senior Case Manager Posting.[3]  On the CFS Employment Application ("CFS Job Application"),[4] completed in applying for both CFS positions, Plaintiff listed her Associate's degree in Legal Studies from Corning Community College, and that she was presently attending University of Wolverhampton and expected to receive an LL.B. in May 2005.  Consistent with the job application, Plaintiff's resumé   ("Plaintiff's resumé"),[5] indicated Plaintiff held an Associate's degree

---

[2] Loesch Dec. Exh. A.
[3] Loesch Dec. Exh. B.
[4] Loesch Dec. Exh. C.
[5] Loesch Dec. Exh. C.

in Legal Studies from Corning Community College, that she was a student at University

of Wolverhampton, United Kingdom, from which Plaintiff anticipated receiving an LL.B.

in May 2005, and that she was in Honor Status for the LL.B.

CFS, in January 2005, hired Plaintiff as Senior Case Manager and Wright as Site

Supervisor.  Other CFS employees at that time included Human Resources ("HR")

Manager Colette Romano ("Romano"), Executive Vice President Reed Stewart

("Stewart"), and Director of Operations Michelle Tarbox ("Tarbox").  CFS attributes its

decision to hire Wright as Site Supervisor to the fact Wright was an attorney with nine

years of experience having been with the Center since 2002, and serving on the

Center's volunteer mediator panel since 1995, giving Wright 10 years mediation

experience.  In contrast, Plaintiff had been with the Center for one year and had no

experience as a volunteer mediator.  It is undisputed that Plaintiff's job duties as a

Dispute Resolution Specialist with the CDRP while operated by the BBB were largely

similar to her job duties as a Senior Case Manager with CFS, for which her job duties

included conducting mediation, outreach to judges and court staff, managing cases, and

coordinating volunteers.  Plaintiff maintains that it was based on her past job

performance with the CDRP where her annual review was good, and her Associate's

Degree, that CFS waived the JD requirement allowing Plaintiff to substitute her work

experience and education.  Complaint at 6.

Although the Senior Case Manager position's job posting indicated the position

was for 21 hours per week, CRJ Director Julie Loesch, Esq. ("Loesch"), initially offered

Plaintiff 28 hours per week, which Plaintiff refused.  In an e-mail to Plaintiff dated

February 2, 2005 ("February 2, 2005 e-mail"),[6] Loesch stated she was willing to reduce Plaintiff's scheduled work hours to 21 to 22 hours per week, which was acceptable to Plaintiff because it allowed Plaintiff to receive a subsidy for child-care, and increasing Plaintiff's pay by $ 3 per hour over what Plaintiff earned working for the BBB.  Loesch also stated "[y]ou are our top choice for the position.  I am very comfortable upgrading your title and salary accordingly. . . ."   February 2, 2005 e-mail.

Plaintiff, as Senior Case Manager, reported to Site Supervisor Wright, her former co-worker at the CDRP.  Plaintiff maintains that soon after commencing the new Senior Case Management position, the work-place environment became hostile with Wright refusing to let Plaintiff perform the full range of her Senior Case Management duties, asserting Plaintiff's accent was an impediment to Plaintiff's communication with CFS clients in Family Court.  Defendant does not dispute that for a period of time Wright did not permit Plaintiff to fully perform her Senior Case Manager position's duties.

In May 2005, Plaintiff's brother passed away and Plaintiff requested and was granted an unpaid leave from CFS from May 17 through June 2, 2005, to attend his funeral in Africa.  Attending her brother's funeral rendered it impossible for Plaintiff to take the final semester law exams that had been scheduled by the University.  Plaintiff maintains that had she been able to take the scheduled exams in May 2005, Plaintiff would have had enough credits from the University to qualify for an LL.B. degree.  Upon returning to her job in June 2005, Wright also began asserting that Plaintiff's lack of a Bachelor's degree rendered Plaintiff unsuitable for performing her job duties with regard to Family Court.  Plaintiff responded by requesting Wright state in a written memorandum Wright's precise position regarding both Plaintiff's English and Wright's

---

[6] Plaintiff's Exh. 10.

perception as to the deficiency of Plaintiff's education credentials or Plaintiff would assume her full duties with regard to Family Court.  Tarbox, CRJ's Director of Operations in Buffalo, New York then intervened by sending Wright an e-mail instructing Wright to allow Plaintiff to perform all the duties of her Senior Case Manager position and Wright complied.  During the first six months she worked in Family Court, the Chautauqua County Family Court Judge was the only one who addressed issues with Plaintiff's accent in a respectable and constructive manner and, despite being praised for her job performance by the Family Court Judges, the court clerks, clients and Wright never missed an opportunity to criticize Plaintiff for her accent.  Complaint at 7; Plaintiff's Affidavit ¶¶ 57-61; 95, 97.

In a November 22, 2005 Memorandum ("November 22, 2005 Memorandum"),[7] Tarbox advised that Plaintiff's behavior at a November 14, 2005 meeting with Wright,[8] during which Plaintiff refused to converse with Wright regarding Plaintiff's job and its protocols, frequently interrupted Wright, and raised her voice several times, constituted insubordination, was not the first incident of such insubordination, and any further incidents would result in Plaintiff's termination of her employment.

 Midway through 2006, Plaintiff, in order to soothe the tension with Wright, promised to resign by the end of January 2007, at which time Plaintiff anticipated beginning review for the bar exam.  Complaint at 7.  In September 2006, however, Plaintiff informed Wright that changes in the international currency exchange rate required Plaintiff to work one more year to raise sufficient funds to permit Plaintiff to finance her Bar Vocational Course ("BVC") in England, and to prolong her course of

---

[7] Loesch Dec. Exh. E.
[8] The November 22, 2005 Memorandum does not indicate that anyone other than Plaintiff and Wright were present at the meeting.

study in law school.  *Id.*  Plaintiff contends that after this announcement, Wright

increased her campaign of hostility toward Plaintiff by attacking Plaintiff's character and

integrity, accusing Plaintiff of lying about her education and suggesting Plaintiff had

failed her law school courses.  *Id.*

In Plaintiff's annual evaluation dated March 6, 2006 ("2006 Evaluation"),[9] Wright

rated Plaintiff's job performance as "marginal."  2006 Evaluation at 3.

In the summer of 2006, CFS commenced an audit ("the audit") of all CRJ staff

members, including the 12 staff members who previously were BBB employees, to

ensure each staff member's credentials were documented as required by CRJ's

principal funding source, New York State Unified Court System.  During the audit, CFS

discovered Plaintiff had not provided documentation establishing her education

credentials.  Accordingly, in a memorandum dated October 2, 2006 ("October 2, 2006

Memorandum"),[10] Romano's assistant, Amanda Diamond ("Diamond"), explained that

during the audit verification of Plaintiff's "education" was discovered missing, and

Diamond requested "a copy of your diploma and/or transcript for your file."  October 2,

2006 Memorandum.  On the Personnel File Audit Form ("Audit Form")[11] completed by

CFS in connection with the audit, next to the category "Education Verification" is a

handwritten notation reading "AAS Sent Request 10/06."  By memorandum dated

October 4, 2006 ("October 4, 2006 Memorandum"),[12] Plaintiff provided a transcript from

Corning Community College establishing she had obtained the Associate's degree, and

responded that with regard to her Bachelor's degree, Plaintiff would forward to Diamond

---

[9] Loesch Dec. Exh. H.
[10] Romano Dec. Exh. E; Plaintiff's Exh. 12.
[11] Plaintiff's Exh. 21.
[12] Romano Dec. Exh. F.

by December 1, 2006, a transcript Plaintiff anticipated receiving from the University and, in the interim, she could send Diamond the most recent report received from the University if necessary.  In an October 9, 2006 e-mail ("October 9, 2006 e-mail"),[13] to the University's Associate Dean of the School of Legal Studies Martin J. Cartwright ("Cartwright"), Plaintiff requested a transcript of her grades for the University's LL.B. program, explaining that the grades reporting system in the United States was different from that used in the United Kingdom, and also requesting Cartwright send Plaintiff any degree she would have earned by January 2007.

On January 11, 2007, Plaintiff sent an e-mail to CFS's Human Resources Department ("HR Complaint"),[14] expressing concern to Romano about Wright's treatment in connection with several recent incidents.  In particular, Plaintiff explains that she was reprimanded by Wright in connection with placing supply orders even though Wright's instructions as to how the orders were to be placed were inconsistent. Plaintiff also complained that after returning from vacation, Plaintiff transferred cases she had temporarily assigned to Wright on the premise the cases would need immediate attention during Plaintiff's absence, back to Plaintiff, which Wright considered the same as going into Wright's personal file cabinet without permission.  When Plaintiff responded that she was only acting in accordance with her assigned job duties, Wright responded that it was not Plaintiff's place to order Wright around.  Plaintiff then described a myriad of issues she had with Wright, largely attributed to Wright's dislike of Plaintiff's accent, asserting that in the three years Plaintiff had worked as a Senior Case Manager with BBB and CFS, she had managed over 1000 cases and mediated more

---

[13] Plaintiff's Exh. 14.
[14] Plaintiff's Exh. 23.

than 100 cases, which was inconsistent with Wright's complaints that Plaintiff's accent interfered with her job performance.  Plaintiff also explained that cultural differences sometimes made it difficult for Plaintiff to pick up on subtle language nuances, which Wright had not before experienced, but that Wright's usual reaction in delivering belittling comments to Plaintiff was not helpful, and Plaintiff had never before had such difficulties with a supervisor.

Also on January 11, 2007, Wright sent an e-mail ("January 11, 2007 e-mail"),[15] to the CFS Senior Site Supervisor from Batavia, Cheryl Robinson ("Robinson"), stating that although Wright previously did not think changes in Plaintiff's personal life were affecting Plaintiff's work performance, Wright's current opinion was that stress in Plaintiff's personal life was affecting Plaintiff's work and behavior which had become erratic, with Plaintiff being moody and unable to maintain her focus.  Wright found "significant" that one Nancy Whitelaw ("Whitelaw"), a family court volunteer with CFS, had been complaining about Plaintiff, because Whitelaw never complained.  Wright also stated that because Plaintiff had indicated her intention to leave CFS in January 2007, Wright had "felt it best to wait this out," but that Plaintiff was now indicating she did not intend to leave CFS until she acquired employment elsewhere, which Wright was not confident would happen soon.  Following Wright's expressed concern regarding Plaintiff's possible delay in tendering her resignation, the need for Plaintiff to provide documentation as to her education credentials was the topic of several conversations between Romano and the CFS staff over the following couple of months.

---

[15] Plaintiff's Exh. 27.

In a January 30, 2007 Memorandum ("January 30, 2007 Memorandum"),[16] Wright reprimanded Plaintiff for refusing to perform a task assigned by Wright, warning Plaintiff that "[i]f this behavior repeats itself, action will be taken up to and including your termination."  In a February 13, 2007 Memorandum ("February 13, 2007 Memorandum"),[17] Plaintiff was again reprimanded by Wright for raising her voice, assertedly in response to Wright's directive that Plaintiff not reassign cases Wright was managing to Plaintiff.  Wright again warned Plaintiff that "[i]f this behavior repeats itself, action will be taken up to and including your termination."  February 13, 2007 Memorandum.

Plaintiff alleges, and Defendant does not dispute, that in February 2007, Senior Site Supervisor Robinson traveled from Batavia to Jamestown to meet with Plaintiff. Robinson allegedly told Plaintiff that CFS management had concluded Plaintiff's job performance problems resulted from the way Plaintiff spoke English and pressured Plaintiff to resign her Senior Case Manager position.  According to Plaintiff, when she refused to do so, Wright and Tarbox advised that if Plaintiff complained about them, she would be fired, and the derogatory treatment and false accusations of insubordination increased.  Plaintiff's Memorandum ¶ 85.

In an e-mail exchange with Romano on March 2, 2007, Romano queried whether Plaintiff's issues with Wright, as expressed by Plaintiff in her January 11, 2007 e-mail to Romano, had been resolved and, if not, requested Plaintiff contact Romano.  Plaintiff responded that since writing the January 11, 2007 e-mail, Plaintiff had received two termination of employment warnings, and requested Romano's assistance in

---

[16] Loesch Dec. Exh. F.
[17] Loesch Dec. Exh. G.

communicating with Wright.  March 2, 2007 e-mails.[18]  Plaintiff maintains she never met

with Romano to discuss the situation with Wright.  In Plaintiff's March 6, 2007 ("2007

Evaluation"),[19] Wright indicates concerns with Plaintiff's job performance which was

rated as "unsatisfactory."  2007 Evaluation at 4.  Wright further stated in regard to a

"Developmental Plan" that Plaintiff "is required to present to the Human Resources

Department no later than 5:00PM on March 21, 2007 a copy of her diploma as

documentation that she obtained a Bachelor Degree, as is a requirement of her position

and as presented in her resumé, application and new hire documents."  *Id.*

On March 7, 2007, CFS's Director of Operations Tarbox traveled from Buffalo to

CFS's Jamestown office and advised that because Plaintiff's Senior Case Manager

position had more job responsibilities than the similar BBB position, Plaintiff's

Associate's Degree was insufficient and Plaintiff needed to produce evidence of her

Bachelor's degree to CFS.  Romano then e-mailed Plaintiff ("March 7, 2007 e-mail"),[20]

advising that Plaintiff's failure to provide "verification of your bachelor degree as soon as

possible but **no later than Wednesday, 3/21/07**," would result in Plaintiff's termination.

March 7, 2007 e-mail (underlining and bold in original).  Plaintiff responded that same

day that she would attempt to comply.

By e-mail to Cartwright dated March 7, 2007 ("March 7, 2007 e-mail"),[21] Plaintiff

acknowledged her understanding that although she was on track to receive from the

University an LL.B. with Honor degree requiring 360 credits, the University could not

simply issue Plaintiff a lower degree based on the number of credits Plaintiff had

---

[18] Romano Dec. Exh. N.
[19] Loesch Dec. Exh. I.
[20] Roman Dec. Exh. G.
[21] Plaintiff's Exh. 15.

already earned without rendering Plaintiff ineligible to ever sit for the bar exam.  Plaintiff,

however, implored the University to issue some documentation establishing Plaintiff had

obtained a Bachelor's degree, as well as verification that the University is accredited,

because Plaintiff's failure to produce such documentation to her employer by March 21,

2007 would result in the termination of Plaintiff's employment which would render

Plaintiff without the funds necessary to complete the LL.B. with honor degree.

In an exchange of e-mails dated March 8, 2007 ("March 8, 2007 e-mails"),[22]

Cartwright responded to Plaintiff that he believed Plaintiff had already been provided

with her transcripts for the University, and Plaintiff replied that although previously her

employer had agreed to accept Plaintiff's University transcripts and the "Guide to Award

Regulations" that established Plaintiff had earned sufficient credits, to obtain her LL.B.

degree without honor, which would not permit Plaintiff to take the Bar Vocational Class,

Plaintiff's employer was now insisting Plaintiff provide the actual LL.B. degree, such that

Plaintiff had no choice but to request the LL.B. degree without honor, despite having

earned 300 credits, with 30 pending for that semester, because waiting for Plaintiff to

earn the additional 30 so as to have the 360 credits necessary for the Bar Vocational

Class would result in the termination of Plaintiff's employment, leaving Plaintiff without

the financial means to complete her education.  Plaintiff's March 8, 2007 transcript from

the University ("Plaintiff's transcript")[23] establishes Plaintiff had earned, by May 2005,

225 credits which, according to the University's Award Guide, was more than the 210

credits needed for an LL.B. degree without honors, and that Plaintiff had since earned

an additional 75 credits.

---

[22] Plaintiff's Exh. 15.
[23] Plaintiff's Exh. 16.

By letter dated March 12, 2007 ("March 12, 2007 letter"),[24] attached to which was Plaintiff's University transcript showing Plaintiff had earned 300 credits, sufficient for a non-honors degree, Cartwright advised Plaintiff the transcript did not include the credits Plaintiff earned for passing an additional law class in January 2007, sufficient for an honors degree which the University would confer on Plaintiff on March 15, 2007.  In an e-mail to Plaintiff dated March 12, 2007 ("March 12, 2007 e-mail"),[25] Cartwright stated "[t]his is to confirm that you [Plaintiff] have sufficient credits to graduate with an Honours Degree.  This will be confirmed at the Award Board when it meets later this week."  By letter dated March 19, 2007 ("March 19, 2007 letter"), [26]  Cartwright advised Plaintiff had "been awarded a Lower Second Law Degree at the Award Board on the 15th March 2007.  A new transcript and degree certificate will be forwarded to you in due course." Plaintiff forwarded the March 19, 2007 letter to Romano by e-mail dated March 19, 2007 ("March 19, 2007 e-mail"), but upon learning Romano was out of the office, forwarded the March 19, 2007 letter to Tarbox, advising that even if expedited, the printing of the formal degree certificate would take up to seven days to have printed.

In a letter to Romano dated March 20, 2007 ("March 20, 2007 Letter"),[27] Plaintiff questioned why CFS was previously willing to accept as sufficient documentation of Plaintiff's education Plaintiff's transcripts establishing Plaintiff had earned a sufficient number of credits to be awarded the LL.B. degree without honor, but was now requiring the actual degree certificate.  Plaintiff reiterated that according to the Award Guide she received upon entering the University, despite having earned the requisite number of

---

[24] Plaintiff's Exh. 16.
[25] Plaintiff's Exh. 16.
[26] Plaintiff's Exh. 16.
[27] Plaintiff's Exh. 18.

credits for an LL.B. degree without honor as of May 2005, such degree was only issued

by the University when the student was failing the LL.B. with honor course of study and,

thus, was incapable of completing studies for the LL.B. degree with honors.  In other

words, that the University had not issued Plaintiff the LL.B. degree without honor

indicated the University's expectation that Plaintiff would earn the credits necessary for

the LL.B. degree with honor, so as to be eligible to take the Bar Vocational Course.

Plaintiff also queried as to why she was now being accused of lying on her application

for the Senior Case Manager position.

    In a letter to Plaintiff dated March 22, 2007 ("March 22, 2007 Romano letter"),[28]

Romano advised that if Plaintiff did present proof the Plaintiff had been awarded a

Bachelor's degree in May 2005 by the end of business on March 26, 2007, Plaintiff's

would be terminated.  In reply to Romano by letter dated March 22, 2007 ("March 22,

2007 Plaintiff letter"),[29] Plaintiff questioned why, despite providing Romano with the

documentation as Romano had requested, including the University's Award Guide[30]

setting forth the requirements for each level of the various law studies degrees issued

by the University, additional documentation was now required, and Romano did not

seem to appreciate the amount of time required for Plaintiff to contact the University.

According to Plaintiff, review of the Award Guide and her recent transcript established

that as of May 2005, Plaintiff had earned 225 credits toward her law degree, which was

sufficient for an LL.B., albeit without honors and, thus, insufficient to permit Plaintiff to sit

for a bar examination.  Plaintiff again explained that per the Award Guide, the University

---

[28] Plaintiff's Exh. 9.

[29] Plaintiff's Exh. 19.

[30] Although Plaintiff has not provided a copy of the University's Award Guide, Defendant disputes neither receiving a copy of the Award Guide from Plaintiff, nor Plaintiff's representation of what it provides with regard to the University's conferring of law degrees.

would issue an LL.B. without honors only to those students for whom continued pursuit of a law degree with honors was not plausible.  Plaintiff also stated she believed her recent poor job performance evaluation of March 6, 2007, was intended as retaliation against Plaintiff for filing a complaint with CFS HR.

By letter dated March 27, 2007 ("termination letter"),[31] Romano terminated Plaintiff's employment with CFS, advising the documentation Plaintiff had provided establishing Plaintiff had been awarded a Bachelor's degree established only that Plaintiff had received such degree almost two years after Plaintiff had applied for the Senior Case Manager position, and it still remained unclear to CFS whether the degree was the equivalent of a Bachelor's degree.  Romano considered Plaintiff's failure to sufficiently verify her education credentials as a discrepancy with Plaintiff's statements in her application for the Senior Case Management position.  Accordingly, Plaintiff was terminated for making a misrepresentation on her application.  Although the University issued Plaintiff a Bachelor of Law degree with Honors, Second Class (2nd Division),[32] on March 15, 2007, Plaintiff did not receive the certificate documenting the degree until after CFS terminated her employment.  According to a Credential Evaluation and Authentication Report issued by World Education Services on January 10, 2008, Plaintiff's Bachelor of Law degree issued in the United Kingdom would be equivalent to a "Bachelor's degree/three years of professional study," in the United States.  WES Credential Evaluation and Authentication Report.[33]

Despite the three written reprimands regarding Plaintiff's job behavior, including the November 14, 2005 Memorandum, the January 30, 2007 Memorandum, and the

---

[31] Plaintiff's Exh. 7; Romano Dec. Exh. R.
[32] Complaint at 11; Plaintiff's Exh. 17.
[33] Complaint at 12.

February 13, 2007 Memorandum, along with Plaintiff's job performance ratings of "marginal" in 2006, and "unsatisfactory" in 2007, the stated reason for Plaintiff's job termination was that Plaintiff did not possess the requisite educational criteria, *i.e.*, a law degree, for the Senior Case Manager position.  Nor does Plaintiff's accent or problems communicating in English appear as issues of concern in her 2006 and 2007 Evaluations.

On May 30, 2007, Plaintiff filed a verified compliant with the New York State Division of Human Rights ("DHR"), alleging unlawful employment discrimination by CFS based on Plaintiff's marital status, national origin, race and color in violation of New York Human Rights Law, Exec. Law Art. 15 ("HRL") ("Administrative Charge").[34]  On December 12, 2007, after investigating Plaintiff's Administrative Charge, the HRL found that Plaintiff's file did not contain evidence establishing that Plaintiff had received a degree equivalent to a bachelor's degree which was the minimal education requirement for the position.[35]  As such, there was no evidence that CFS's termination of Plaintiff's employment because Plaintiff did not possess a bachelor's degree was not a pretext for discrimination.  Plaintiff then commenced the instant action.

In January 2008, another CFS employee, Jeanne Kratt ("Kratt"), who is white and does not speak with an accent, advised Plaintiff that Kratt had a similar problem when CFS requested proof of Kratt's education credentials, but Kratt was not terminated.  In an e-mail to Plaintiff dated July 30, 2008 ("July 30, 2008 e-mail"),[36] Kratt recounted receiving from DFS HR a letter dated June 18, 2007, requesting Kratt forward to CFS HR by June 25, 2007, documentation of Kratt's Bachelor's degree which was missing

---

[34] Files as an exhibit to the Complaint at 30-32.
[35] Filed as an exhibit to the Complaint at 25-29.
[36] Plaintiff's Exh. 22.

from Kratt's personnel file.  Kratt, however, was on vacation when the June 18, 2007

letter was sent and did not see the letter until after the June 25, 2007 deadline, so Kratt

telephoned Tarbox to explain the circumstances to her.  Kratt also explained that

because she could not locate a copy of her diploma, she would have to obtain one from

the State University of New York at Buffalo ("UB").  Kratt's work schedule, however, did

not allow for Plaintiff to go to UB until July 12, 2007, at which time Kratt was advised

that because of a computer problem, the requested documentation could not be

provided at that time.  A UB representative, Mary-Camile Schwindler ("Schwindler"),

eventually contacted CFS and provided sufficient assurance that the matter was being

investigated.  Kratt finally obtained the requested documentation on September 12,

2007, and provided a copy to CFS.  Upon receiving a copy of Kratt's degree, Loesch

informed Kratt another employee had recently been discharged for failing to provide

documentation of her degree, admitting in response to Kratt's inquiry that such

employee was Plaintiff.  Loesch also told Kratt HR had been asking Kratt for a copy of

her degree for more than one year, prompting Kratt to insist the first request she saw for

a copy of her degree was the June 18, 2007 letter.  Loesch then advised Kratt that the

earlier requests were sent by e-mail, but Erie County Family Court, where Kratt worked,

did not have Internet access until July 2007.  Nevertheless, Kratt's employment was not

terminated despite more than one year elapsing between CFS's initial request for a

copy of Kratt's degree, and Kratt's providing CFS with the same.

## DISCUSSION

**1.      Summary Judgment**

Defendant argues in support of summary judgment that the evidence in the record establishes Plaintiff's employment with CFS was terminated upon discovering Plaintiff had misrepresented her education credentials on her employment application and continued to mislead CFS after verification of her credentials was requested as part of a routine audit such that Plaintiff cannot establish a *prima facie* case of discrimination based on wrongful termination.  Defendant's Memorandum at 1, 3-9.  With regard to the retaliation claim, Defendant argues Plaintiff cannot demonstrate she engaged in the requisite protected activity and, even if she could, Defendant had a legitimate, nondiscriminatory basis for terminating her.  *Id.* at 9-12.  Defendant argues with regard to Plaintiff's harassment claim that such claim is belated and relies on allegations outside the Complaint, was not administratively exhausted, and fails to allege harassment that was severe and pervasive.  *Id.* at 12-17.  Defendant further maintains any hostile work environment claim cannot be imputed to Defendant, *id.* at 17-21, and Plaintiff's state HRL claim is barred under the election of remedies doctrine.  *Id.* at 21-22.

In opposition to summary judgment, Plaintiff argues she has demonstrated a *prima facie* case of employment discrimination because although she was qualified for her Senior Case Manager position, she was terminated based on her race, color, and national origin, and that Defendant's asserted termination of Plaintiff for lack of a Bachelor's degree is mere pretext for discrimination.  Plaintiff's Memorandum at 3-14. Plaintiff also maintains she has established a *prima facie* case of retaliation because her HR complaint made in the January 11, 2007 e-mail to Romano drove Wright to push for Plaintiff's termination.  *Id.* at 14-18.  Plaintiff maintains her hostile work environment

claims are sufficiently related to the claims included in her Administrative Charge as to fall within the scope of the EEOC's investigation and put Defendant on notice of such claim, *id.* at 18-20, that Defendant's hostile conduct was sufficiently severe and pervasive, *id.* at 20-22, and that the hostile conduct can be imputed to CFS. *Id.* at 22-24. Plaintiff also withdraws her state HRL claim. *Id.* at 24-25.

In further support of summary judgment, Defendant argues no improper factor influenced Defendant's decision to terminate Plaintiff's employment which was based solely on Plaintiff's misrepresentation of her education credentials, Defendant's Reply at 1-6, that Plaintiff is not similarly situated to Kratt, *id.* at 6-7, and there is no evidence of retaliation. *Id.* at 7-8. Defendant further argues Plaintiff's hostile work environment claim was not pleaded in the Complaint and not reasonably related to her Administrative Charge, *id.* at 8-9, that the alleged harassment was neither severe nor pervasive, *id.* at 9, and that no hostile work environment claim can be imputed to CFS because although Plaintiff reported to Wright, Wright had no independent authority to take any disciplinary action against Plaintiff. *Id.* at 9-10.

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). The court is required to construe the evidence in the light most favorable to the non-moving party. *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011). The party moving for summary judgment bears the burden of establishing the nonexistence of any

genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions."  *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

2.    **Employment Discrimination**

Plaintiff claims she suffered employment discrimination based on her race, color and national origin when Defendant terminated Plaintiff's employment because of her French accent which Plaintiff, who was raised in Zaire, Africa, attributes to the fact her native language is French.  Plaintiff's Memorandum at 1.  Plaintiff denies she misrepresented her education credentials on her employment application, asserting CFS knew when Plaintiff was hired that Plaintiff did not then possess a Bachelor's degree, yet placed no conditions on Plaintiff's hiring, deciding Plaintiff possessed sufficient education and experience in accordance with the job posting given that Plaintiff had been performing essentially the same job for BBB prior to being hired by CFS.  *Id.* at 1.  It was only two weeks before Plaintiff's termination that Defendant decided Plaintiff needed a Bachelor's degree for the Senior Case Manager position, and five days before her termination that Defendant insisted Plaintiff produce proof she possessed a Bachelor's degree in May 2005, despite knowing Plaintiff only stated on her employment application she anticipated receiving the degree in May 2005.  *Id.*

Plaintiff's employment discrimination claims are brought pursuant to Title VII which applies the "*McDonnell Douglas*" burden-shifting test.  *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Upon meeting this *de minimus* burden of establishing a *prima facie* case of employment discrimination, *Brennan v. Metropolitan Opera Association, Inc.*, 192 F.3d 310, 316-17 (2d Cir. 1999) (citing *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)), the burden shifts to Defendant to offer a legitimate, non-discriminatory reason for the challenged actions.  *Terry*, 336 F.3d at 138 (citing

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (Title VII); and *Schnabel*, 232 F.3d at 87 (ADEA)).  Once Defendant has asserted a neutral reason for the alleged discriminatory action, "the inference of discrimination raised by the prima facie case then drops out and the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason is merely a pretext for discrimination."  *Brennan*, 192 F.3d at 317 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993)).  *See also Terry*, 336 F.3d at 138 ("'to defeat summary judgment, the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" (citing *Stern v. Trustees of Columbia*,131 F.3d 305, 312 (2d Cir. 1997))).

### A.    Disparate Treatment Claim

Plaintiff claims she was subjected to disparate treatment based on her race, color, and national origin.  Defendant argues in support of summary judgment that Plaintiff cannot establish a *prima facie* case of employment discrimination based on disparate treatment because Plaintiff cannot show she was qualified for her position.  Defendant's Memorandum at 5-9.  Plaintiff maintains she can establish all four elements of a *prima facie* disparate treatment claim.  Plaintiff's Memorandum at 3-8.  In further support of summary judgment, Defendant argues Plaintiff can only establish one of the four elements of a *prima facie* case of employment discrimination, *i.e.*, an adverse employment action, but cannot establish the remaining three elements, and also fails to point to evidence showing Defendant's legitimate reason for terminating Plaintiff's employment was mere pretext for discrimination.  Defendant's Reply at 3-7.

### 1.   *Prima Facie* Case

To establish a *prima facie* case of employment discrimination based on disparate treatment in violation of Title VII or the ADEA, Plaintiff must demonstrate (1) she belonged to a protected class; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  *Terry*, 336 F.3d at 137-38 (citing *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (ADEA); and *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002) (Title VII)).

In the instant case, it is not disputed that Plaintiff, as an African-American born in Zaire, Africa, whose native language is French, is a member of three classes, including race, color and national origin.  Because "[n]ational origin discrimination includes 'the denial of employment opportunity because . . . an individual has the . . . linguistic characteristics of a national group.'"  *Altman v. New York City Department of Education*, 2007 WL 1290599, at * 4 (S.D.N.Y. May 1, 2007) (quoting *Rivera v. Baccarat, Inc.*, 10 F.Supp.2d 318, 324 (S.D.N.Y. 1998) ("Accent and national origin are obviously inextricably intertwined in many cases."), Plaintiff meets the first of four criteria for a *prima facie* disparate treatment case of employment discrimination based on race, color and national origin.

The parties also agree that the termination of Plaintiff's employment was an adverse employment action.  The parties, however, disagree as to whether Plaintiff was qualified for the teaching position from which she resigned, with Defendant maintaining Plaintiff did not possess in May 2005 a Bacherlor's degree, as well as whether Plaintiff's job performance was deficient because of her accent.  A review of the evidence

submitted in connection with Defendant's motion establishes genuine issues of material

fact with respect to the second factor, *i.e.*, whether Plaintiff was qualified for the Senior

Case Manager position, as well as the fourth factor pertaining to whether there was a

causal connection between the termination of Plaintiff's employment and Plaintiff's

membership in a protected class.

### a.    Qualified for Senior Case Manager Position

Defendant insists Plaintiff was not qualified for the Senior Case Manager position

because Plaintiff, who did not have a J.D. when she applied for the position, stated on

her employment application she expected to receive her Bachelor of Law degree from

the University of Wolverhampton in May 2005, but did not receive such degree until

March 15, 2007.  Defendant's Memorandum at 5-6.  According to Defendant, Plaintiff

was rightfully terminated for not possessing the requisite education credentials for the

Senior Case Manager position, as well as for misrepresenting her education credentials

on her employment application because Plaintiff did not obtain her Bachelor's degree in

May 2005, and then continued to mislead CFS about her education when asked to

verify it.  *Id.* at 6.  Defendant asserts that the documents and correspondence Plaintiff

produced, rather than establishing her education credentials, prove only that Plaintiff did

not receive her Bachelor's degree until March 2007, which is consistent with Plaintiff's

deposition testimony confirming Plaintiff knew that attending a funeral in Africa in May

2005 would cause her to miss taking a final University examination and delay receipt of

the degree.  *Id.* at 7-8.

In opposition, Plaintiff relies on the job posting for the Senior Case Manager

position which described the education requirement as

> Juris Doctorate (J.D.) from an accredited law school with one to two years experience and/or training in the area of Family Law; <u>or equivalent combination of education and experience</u>.

Plaintiff's Memorandum at 4 (quoting Plaintiff's Exh. 4 (underlining added)).

Plaintiff, despite having experience in Family Law, admittedly did not possess a J.D., but that Plaintiff did meet the alternative requirement of an "equivalent combination of education and experience," is consistent with Defendant's own admission that "'CFS determined that [Plaintiff] was minimally qualified for her position and hired her.'" *Id.* (quoting Defendant's Memorandum at 5-6).  Defendant does not dispute never it raised the issue of Plaintiff's education credentials being insufficient and a justification for Plaintiff's termination until Loesch stated as much in her declaration filed in support of summary judgment on May 24, 2013, more than eight years after CFS hired Plaintiff in 2005 to perform essentially the same job Plaintiff had successfully performed for more than one year for the BBB.  *Id.* at 4-5.  Plaintiff also points to Loesch's statements in her February 2, 2005 e-mail to Plaintiff that "[y]ou are our top choice for the position.  I am very comfortable upgrading your title and salary accordingly . . . ."  *Id.* (citing February 2, 2005 e-mail).  Significantly, Plaintiff was never told her hiring for the Senior Case Manager position was conditioned upon Plaintiff's receipt of her Bachelor's degree, and Defendant never questioned Plaintiff's education credentials until October 2, 2006, well after Wright began to persistently complain about Plaintiff's accent, at which time Defendant requested "a copy of your diploma and/or transcript for your file."  October 2, 2006 e-mail.  *Id.* at 5 .  Plaintiff responded to the request by forwarding a copy of her transcript from her Associate's degree, assuring she would send a copy of her most recent transcript from her Bachelor's degree studies by December 1, 2006.  October 4,

2006 Memorandum.  Plaintiff's provision of proof of her Associate's degree is also consistent with the Audit Form's handwritten notation "AAS Sent Request 10/06," indicating that Defendant sent a request for Plaintiff's Associate's degree in October 2006, and that Defendant made no more requests regarding Plaintiff's education credentials until March 6, 2007, when Wright requested in Plaintiff's employee evaluation that Plaintiff produce proof of her Bachelor's degree, 2007 Evaluation at 4, by which time Wright had expressed in writing to Robinson her desire to see Plaintiff leave as well as given Plaintiff two written notices threatening to terminate Plaintiff's employment.  *Id.*

In further support of summary judgment, Defendant argues Plaintiff's own admissions establish no basis for Plaintiff's claim in her job application that she would receive a Bachelor's degree in May 2005, and continued to mislead CFS about such fact even after Plaintiff was requested to produce documentation of her education credentials in connection with the audit.  Defendant's Reply at 1-2.  According to Defendant, it was important that Plaintiff have a legal degree because the Senior Case Manager position required familiarity with legal concepts and a Family Court judge had expressed concerns about having someone with an adequate legal background.  *Id.* at 2.  Defendant maintains its requests for Plaintiff's credentials were consistent and Plaintiff was not terminated until it became clear that she could not verify the credentials stated on her job application.  *Id.*  Defendant further maintains it never told Plaintiff she could verify her education credentials by belatedly providing proof she had obtained her LL.B. degree more than two years after she was hired.  *Id.* at 3.

A review of the evidence establishes a genuine issue of material fact as to whether Plaintiff was qualified for the Senior Case Manager position she held for two years before being terminated for not possessing a degree that was not required according to the description in the job posting for the position.  Specifically, the job posting stated the required education as either a Juris Doctorate from an accredited law school with at least one year of work experience with family law, or an "equivalent combination of education and experience."  Job Posting - Senior Case Manager/Settlement Conference Facilitator (Chautauqua).[37]  As such, a plain reading of the job posting establishes that the successful applicant for the Senior Case Manager position was not required to possess a law degree with one to two years of experience working in family law, but could have a combined educational background and work experience that was deemed equivalent and it is undisputed that it was this alternative criteria upon which Plaintiff was hired.  Significantly, Defendant has not provided any document or an affidavit from any CFS executive, manager, or employee explaining or otherwise defining what combination of educational background and work experience would be considered the equivalent of a J.D. and one to two years of experience working with family law, and Defendant does not argue the person employed as the Senior Case Manager was required to perform duties that could only be handled by someone with a law degree or an attorney.  Nor has Defendant explained why Plaintiff's education in a British program of study for an LL.B. or Bachelor of Law degree, of which Defendant was aware when it hired Plaintiff, as stated on her resumé and employment education, was deemed sufficient when Plaintiff applied for the Senior Case Manager position, but in retrospect was insufficient.  Coupled with Defendant's belated concerns

---

[37] Loesch Dec. Exh. B.

regarding Plaintiff's educational credentials, Wright's repetitive complaints regarding Plaintiff's alleged communication skills and administrative breaches raise an inference that Plaintiff's discharge resulted from discriminatory motives unrelated to those credentials.

There is also a question as to the credibitility of Defendant's assertion that Plaintiff misrepresented her education credentials on her resumé or employment application when Plaintiff applied for the Senior Case Manager position in January 2005, given that on her resumé, Plaintiff indicated she would have a Bachelor's degree from the University in May 2005, some four months later, which was consistent with Plaintiff's employment application on which Plaintiff specified that she was then presently a student at the University from which Plaintiff expected to complete her LL.B. in May 2005. Although Defendant was aware Plaintiff anticipated receiving the LL.B. degree in May 2005, Defendant apparently did not question what impact, if any, Plaintiff's travel to Africa in May 2005 for her brother's funeral would have on Plaintiff's completion of the degree or whether Plaintiff's failure to complete the degree in May 2005 would possibly rendering Plaintiff in violation of Defendant's hiring requirements for the Senior Case Manager position.

Significantly, Loesch's statements in the February 2, 2005 e-mail, upon hiring Plaintiff despite Plaintiff not yet receiving her LL.B. degree, that "[y]ou are our top choice for the position. I am very comfortable upgrading your title and salary accordingly. . . " is further evidence that Plaintiff's failure to actually possess a law degree was not a consideration in deciding to hire Plaintiff, or that Loesch's decision was subject to Plaintiff's actually completing her studies in May 2005 to become eligible for the British

LL.B.  This is consistent with the fact that Plaintiff worked for CFS for more than two years, *i.e.*, beginning in February 2005, before Defendant ever questioned in March 2007 the legitimacy of the LL.B. degree program in which she was enrolled.

Moreover, Defendant has failed to produce any affidavit from anyone involved in the September 2006 audit of CFS's employee's credentials calling into question the absence from Plaintiff's personnel file of proof of her education, despite Defendant's assertion, Romano Declaration ¶ 10, that the audit was performed to assure compliance with the requirements of CRJ's principal funding source, New York State Unified Court System.  As such, with what provision of the state courts' requirements CFS was seeking compliance is simply unknown.  It is significant that Diamond's October 2, 2006 Memorandum to Plaintiff merely advised that CFS was "missing verification of your education.  We will need a copy of your diploma and/or transcript for your file."  October 2, 2006 Memorandum.  That Diamond never specifically referred to documentation of Plaintiff's LL.B. degree, and indicated a willingness to accept Plaintiff's transcript could be interpreted by a reasonable jury as seeking a copy of Plaintiff's diploma for her Associate's degree in legal studies, and Plaintiff's transcript for her LL.B. degree which Plaintiff had yet to complete.  This is consistent with Plaintiff's assertion, Plaintiff's Declaration ¶ 52, that the handwritten notation on the Audit Form reading "AAS Sent Request 10/06" indicates CFS was seeking verification only of Plaintiff's Associate's degree and it was not until March 2007 that CFS demanded Plaintiff produce verification that she earned a Bachelor's degree, presumably the LL.B. from the University, in May 2005.

A further issue of fact is raised by Plaintiff's documentation explaining that in the

United Kingdom, an LL.B. degree without honor is the equivalent of a Bachelor's degree

and although it is a law degree, it is insufficient to qualify one to sit for the bar exam.

Rather, in the United Kingdom, a student pursuing an education in law continues to take

courses until her grades are insufficient to warrant the student remaining in the field of

study, at which time the student is awarded a degree based on the number of credits

successfully earned, the lowest of which is an LL.B. without honor which is insufficient

to permit sitting for the bar exam, but the equivalent of a Bachelor's degree in the United

States.  As Cartwright explained to Plaintiff in his March 12, 2007 letter, Plaintiff then

had 300 credits, which was sufficient to award Plaintiff a non-honors degree, but with

the credits Plaintiff had earned from a course she recently passed, which the University

had yet to post to her transcript, Plaintiff then had sufficient credits to be awarded an

honors degree.  In her March 20, 2007 Letter, Plaintiff explained to Romano that

according to page 29 of the University's Award Guide, to be awarded an LL.B. without

honors, a student must take classes for 210 credits, of which 180 must be passed, and

Plaintiff's transcript established that as of May 2005, Plaintiff had taken classes totaling

225 credits, all of which Plaintiff had passed, such that Plaintiff was, in May 2005,

eligible for an LL.B. degree, without honors, which Plaintiff would have then been

awarded but for the fact that she was succeeding at her studies and on track to earn a

higher degree that would permit Plaintiff to take the Bar Vocational Course to become

an attorney.  March 20, 2007 Letter at 2.  Plaintiff reiterates that she had recently been

awarded such degree.  *Id.*  As such, Plaintiff's transcript dated March 8, 2007,

establishes Plaintiff had successfully completed sufficient credits to be awarded an

LL.B. degree without honor by May 2005.  Further, Plaintiff's receipt of the Bachelor of

Law with Honors degree, Second Class (2nd Division), on May 15, 2007, which would

allow Plaintiff to sit for the British bar exam, could likely establish to a reasonable jury

that the awarded degree was above the equivalent of the Bachelor of Law degree

Defendants sought.

The record thus establishes genuine issues of material fact as to whether Plaintiff

was qualified for the Senior Case Manager position when she applied, and the court

next addresses whether, assuming Plaintiff was qualified for the position, there exists a

causal connection between Plaintiff's termination and her membership in a protected

class based on Plaintiff's color, race, or national origin.

### b. Causal Connection

Because Defendant limits its argument that Plaintiff cannot establish a *prima*

*facie* case of disparate treatment to Plaintiff's inability to demonstrate she possessed

the requisite combination of education and experience to be qualified for the Senior

Case Manager position, Defendant has not addressed whether Plaintiff meets the fourth

prong of the *prima facie* disparate treatment claim.  Plaintiff, however, argues in

opposition to summary judgment there is evidence in the record that Defendant's true

reason for terminating Plaintiff's employment was her race and ethnic origin as

manifested by her French accent.  Plaintiff's Memorandum at 6-8.  In further support of

summary judgment, Defendant argues that although Plaintiff does not dispute Romano

terminated Plaintiff's employment after consulting with Loesch, nothing in the record

suggests Romano or Loesch was influenced by improper factors.  Defendant's Reply at

4.  Evidence in the record establishes genuine issues of fact as to whether there was a

causal connection between Plaintiff's race, color and national origin and Defendant's termination of Plaintiff's employment.

To establish the fourth prong of a *prima facie* case of disparate treatment, *i.e.*, a causal relationship between the plaintiff's membership in a protected class and the adverse employment action, the plaintiff

> need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act.  So-called but-for causation is not the test.  It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.

*University of Texas Southwest Medical Center v. Nassar*, __ U.S. __; 113 S.Ct. 2517, 2522-23 (2013).

Accordingly, to establish the causation factor for a *prima facie* case of unlawful employment discrimination, the plaintiff need not demonstrate that her membership in a protected class was the sole cause of the adverse employment action but, rather, she needs to show only that her membership in such a class played a motivating role in the decision.  *See Parker v. Columbia Pictures Industries*, 204 F.3d 326, 337 (2d Cir. 2000) (discussing mixed-motive analysis in context of Title VII and equally applying it to disability-based employment discrimination cases under ADA).  The causation factor can be, and often is, established solely by circumstantial evidence because "'[a]n employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent."  *Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998) (quoting *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991)).  *See also Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes" with regard to alleged employment discrimination).

A plaintiff alleging disparate treatment must also show the adverse employment action occurred under circumstances giving rise to an inference of discrimination, which is generally accomplished by "showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside the protected group.'" *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). "A plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). Although whether two employees are similarly situated generally presents a question of fact for the jury, *Graham*, 230 F.3d at 39 (citing cases), "[t]his rule is not absolute, [ ], and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Associates v. Incorporated Village of Mineola*, 273 F.3d 494, 499 n. 2 (2d Cir. 2001) (citing *Cruz v. Coach Stores*, 202 F.3d 560, 568 (2d Cir. 2000)). "In this analysis, there must be an 'objectively identifiable basis for comparability' between the plaintiff and the comparator employee, which includes an assessment of 'whether the conduct for which the employer imposed discipline was of comparable seriousness.'" *Zuk v. Onondaga County*, 471 Fed.Appx. 70, 71 (2d Cir. 2012) (quoting *Graham*, 230 F.3d at 40). In the instant case, Plaintiff has established the requisite "objectively identifiable basis for comparability" for causation.

Specifically, Plaintiff has provided evidence that another CFS employee, Kratt, from whom CFS also sought documentation of her education credentials, was given more than one year to comply. July 30, 2008 letter. Significantly, Kratt explains that although she did not receive notice that documentation of her Bachelor's degree from

UB was missing from her personnel file until June 25, 2007, Loesch advised Kratt the initial request for such documentation was sent more than one year before Kratt obtained a copy of her degree in on September 12, 2007. *Id.* at 2.  Reasonable jurors may find Defendant's argument, Defendant's Reply at 6-7, that Kratt is not similarly situated to Plaintiff because, "unlike Plaintiff, Kratt had fulfilled all the requirements for her degree as of the graduation date indicated in her application to CFS," to be disingenuous insofar as, absent proof of the degree, which Kratt maintains was not provided to CFS for more than one year after it was first requested, CFS could not be certain Kratt had, in fact, received such degree so as to justify providing Kratt with additional time to provide the documentation.  Accordingly, because Kratt is indisputably white and spoke with not noticeable foreign accent, there is an issue of material fact as to whether Plaintiff was treated differently from Kratt based on the fact of Plaintiff's race and national origin as manifested by Plaintiff's accent.

Having established a *prima facie* case of employment discrimination based on race and ethnicity, the court next considers the legitimacy of Defendant's asserted reason for terminating Plaintiff.

### 2.    Non-Discriminatory Reason for Adverse Employment Action

Defendant asserts its reason for terminating Plaintiff, *i.e.*, that Plaintiff did not meet the Senior Case Manager position's education requirements and misrepresented her education credentials on her employment application, is legitimate and non-discriminatory.  Defendant's Memorandum at 8-9.  In support of its decision to terminate Plaintiff's employment, Defendant relies on CFS's Employee Handbook's provision that any falsification, material omission, or material misrepresentation in an employee's job

application is ground for termination regardless of when such transgression is discovered.  *Id.*  According to Defendant, Plaintiff misrepresented her expectation that she would receive a Bachelor of Law degree in May 2005, then misled Defendant about the fact that Plaintiff did not receive such degree at that time and the document Plaintiff provided CFS in March 2007 as proof she had received the degree "showed that [Plaintiff] had obtained a 'Lower Second Law Degree,' [for which] CFS had no way of determining whether this degree was equivalent to the degree she was supposed to have obtained in May 2005."  *Id.*  In opposition to summary judgment, Plaintiff argues Defendant's proffered legitimate, nondiscriminatory reason for Plaintiff's employment termination is deceiving and, to a fact trier, unworthy of belief because Plaintiff never, in applying for the Senior Case Manager position, asserted she already had obtained a Bachelor of Law degree, such that she cannot be found to have lied on her employment application, and Plaintiff was never advised obtaining the LL.B. degree was a requirement of her job.  Plaintiff's Memorandum at 8.  According to Plaintiff, Defendant never advised Plaintiff until five days before her termination that her job required a Bachelor's degree.  *Id.*  In further support of summary judgment, Defendant argues Plaintiff's own admissions during her deposition establish Plaintiff had no basis when applying for the Senior Case Management position for claiming she expected to receive her Bachelor's degree in May 2005, and continued to mislead CFS for months after CFS sought verification of Plaintiff's education credentials as part of a routine audit. Defendant's Reply at 1-2.[38]  A plain review of the record establishes genuine issues of

---

[38] In support of this assertion, Defendant references statements made at Plaintiff's deposition in which Plaintiff admits that she did not receive an LL.B. in May 2005 because she had missed an exam. Feinstein Dec. Exh. C.  Given the context of the portion of the deposition testimony, Plaintiff's further testimony that she knew in May 2005 she was not then eligible for a Bachelor's degree because she had

material fact as to whether Defendant's termination of Plaintiff for not obtaining a

Bachelor's degree was legitimate.

In particular, Defendant has failed to establish that Plaintiff was ever advised her

receipt of the LL.B. degree in May 2005 was critical to Defendant's determination that

Plaintiff had a combination of education and experience equivalent to a J.D. and one to

two years experience in family law.   Although CFS first raised the issue of verification of

Plaintiff's education credentials in September 2006, Plaintiff's provision of a copy of her

Associate's degree on October 4, 2006, is consistent with the handwritten notation on

the Audit Form reading "AAS Sent Request 10/06," as well as the fact that Plaintiff was

never required to produce actual proof of her Bachelor's degree until March 22, 2007,

five days before Plaintiff was terminated.   March 22, 2007 Romano letter.   By that date,

Plaintiff had produced her transcript from the University at Wolverhampton establishing

she had earned 225 credits as of May 2005, and offered to show Romano the

University's Award Guide that would establish only 210 credits were required for the first

level LL.B. degree conferred by the University, albeit a degree that did not qualify the

recipient to pursue the Bar Vocation Course so as to seek bar admission, but Romano

did not follow up with the offer.   March 20, 2007 letter.   Furthermore, insofar as

Defendant maintains Plaintiff gave deposition testimony admitting she did not have

sufficient credits in May 2005 to obtain even the LL.B. degree without honors, Feinstein

Declaration ¶ 32, such statement is inconsistent with the copy of Plaintiff's transcript

---

missed an exam and, even had Plaintiff not missed the exam, she still would have been shy of credits
necessary for the exam, it is unclear whether Plaintiff is referring to the fact she would have been
ineligible for an LL.B. with honors, allowing for Plaintiff to sit for the British bar exam, or that she would
have been ineligible even for an LL.B. without honors, which would not have permitted Plaintiff to sit for
the British bar exam.   Nevertheless, that Plaintiff's University transcript, Plaintiff's Exh. 16, indicates
Plaintiff, even without having sat for the missed exam, had as of May 2005, the 225 credits necessary for
an LL.B. without honors, a reasonable jury could find the former, rather than the latter explanation is more
plausible.

establishing she had earned 225 credits as of May 2005, more than the 210 needed for the non-honors LL.B. degree, reasonably suggesting Plaintiff may well have been honestly mistaken as to the requirements for the LL.B.

Accordingly, there are genuine issues of material fact in the record from which a reasonable jury could conclude that Plaintiff lacked any fraudulent intent regarding her qualifications when she applied for the Senior Case Manager position and that Defendant's proffered reason for terminating Plaintiff's employment, although non-discriminatory, was not legitimate.

### 3.      Mere Pretext for Discrimination

Even assuming, *arguendo*, Defendant had established a legitimate, nondiscriminatory reason for terminating Plaintiff, there is evidence in the record such reason is mere pretext for discrimination.

Where the defendant articulates a nondiscriminatory reason for its challenged actions, "the presumption of discrimination is rebutted and it 'simply drops out of the picture.'"  *Connell v. Consolidated Edison Co. of New York, Inc.*, 109 F.Supp.2d 202, 207 (S.D.N.Y. 2000) (quoting *St. Mary's Honor Center*, 509 U.S. at 510-11).  Then the plaintiff must show, "without the benefit of any presumptions, that more likely than not the employer's decision was motivated at least in part by a discriminatory reason."  *Id.* (citing *Grady v. Affiliated Center, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).  Plaintiff, to demonstrate Defendant's proffered reason was not the true reason for the adverse employment action, may either directly persuade the court that the employer was more likely motivated by a discriminatory reason or indirectly show the employer's proffered explanation is unworthy of credence.  *Texas Dept. of Community Affairs v. Burdine*, 450

U.S. 248, 256 (1981).  Plaintiff may do this by relying on the evidence already presented to establish a *prima facie* case, as well as any additional evidence.  *Id.* (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000)).  Further, "because the fourth prong of the prima facie case in this context is proof of circumstances giving rise to an inference of discrimination, as a practical matter, there is little difference between the evidence that a plaintiff would present in proving just the prima facie case and pretext in proving the 'ultimate fact of discrimination.'"  *Id.* at 208 n. 5.  Rather, in an employment discrimination action, the ultimate fact of discrimination may be inferred from the falsity of the employer's explanation for the adverse employment action.  *Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination and it may be quite persuasive." (citing *St. Mary's Honor Center*, 509 U.S. at 517)).

Here, Plaintiff asserts that pretext can be established because Plaintiff has produced evidence that CFS does not uniformly apply its progressive discipline policy, and has made statements that reasonable jurors could find were inconsistent, contradictory or otherwise implausible as compared to those statements made in connection with the termination of Plaintiff's employment.  Plaintiff's Memorandum at 9-11.  Plaintiff further maintains Wright, as Plaintiff's supervisor, acted with a discriminatory motive based on Plaintiff's national origin, as evidenced by Wright's issues with Plaintiff's accent, in arranging for Plaintiff's termination.  *Id.* at 11-14.  In further support of summary judgment, Defendant argues no evidence in the record shows any concerns about Plaintiff's accent led to the termination of Plaintiff's

employment, nor does Plaintiff point to any evidence establishing Romano or anyone else at CFS had been advised that Wright was hostile toward Plaintiff because of her accent.  Defendant's Reply at 4-6.  The same evidence on which Plaintiff relies to establish a causal connection between Plaintiff's membership in a protected class and Defendant's termination of her employment, however, also can be construed by a reasonable jury as demonstrating Defendant's proffered reason for terminating Plaintiff is mere pretext for discrimination, particularly based on national origin and race.

Specifically, "[n]ational origin discrimination includes 'the denial of employment opportunity because . . . an individual has the . . . linguistic characteristics of a national group.'"  *Altman v. New York City Department of Education*, 2007 WL 1290599, at * 4 (S.D.N.Y. May 1, 2007) (quoting *Rivera*, 10 F.Supp.2d at 324 ("Accent and national origin are obviously inextricably intertwined in many cases.")).  Thus, "'an adverse employment decision may be predicated upon an individual's accent when – but only when – it interferes materially with job performance.'"  *Id.* (quoting *Meng v. Ipanema Shoe Corp.*, 73 F.Supp.2d 392, 399 (S.D.N.Y. 1999) (quoting *Fragrante v. City and County of Honolulu*, 888 F.2d 591, 596-97 (9th Cir. 1989))).  "The key inquiry is whether the 'comments about a person's accent may be probative of discriminatory intent.'"  *Id.* Furthermore, an adverse employment action tied to an employee's accent has been held to support claims for discrimination based on both national origin and race.  *See Shao v. City University of New York*, 2014 WL 5038389, at ** 5, 12 (S.D.N.Y. Sept. 30, 2014) (denying summary judgment on employment discrimination claim based on race and national origin where the plaintiff presented evidence that defendant supervisor expressed her hatred toward the plaintiff based on the plaintiff's accent and the

plaintiff's employment was terminated soon afterward).  Here, the questions regarding

the credibility of Defendant's proffered reason for terminating Plaintiff's employment,

*i.e.*, Plaintiff's failure to provide proof she had obtained a Bachelor's degree in May

2005, as discussed above in connection with the causal connection element of Plaintiff's

*prima facie* case of employment discrimination, Discussion, *supra*, at 33-35, leaves

open the possibility that the real reason for terminating Plaintiff's employment was her

accent and, thus, her national origin, as well as her race.

In particular, there is evidence in the record that Wright routinely complained of

Plaintiff's accent, which is attributed to Plaintiff's national origin, a fact Defendant does

not dispute.  Specifically, when Plaintiff first commenced work as a Senior Case

Manager with CFS, Wright interfered with Plaintiff's performance of some of her job

duties, asserting Plaintiff's accent was an impediment to Plaintiff's delivery of services to

CFS clients in Family Court.  Plaintiff's Declaration ¶ 87; Complaint at 6-7.  It was not

until CFS's Director of Operations Tarbox intervened by sending an e-mail instructing

Wright to permit Plaintiff to perform all the functions of her job that Wright allowed

Plaintiff to perform the Family Court duties of her job, *id.*, a fact not disputed by

Defendant.[39]  Among the questions of an evaluation sheet created by Wright for use by

all CFS clients to evaluation CFS staff was the question, "Do you understand what the

mediator was saying."  Plaintiff's Declaration ¶ 90.  Wright removed the question from

the evaluation sheets after someone from CFS's main office in Buffalo rejected it.  *Id.*

Nor is there any evidence in the record, including, *inter alia*, in the 2006 and 2007

Evaluations on which Plaintiff's overall job performance was rated, respectively, as

---

[39] Not only does Defendant not deny that Wright did interfere with Plaintiff's performance of all functions of her Senior Case Manager position, but neither Wright nor any other CFS employee offers any explanation as to why Wright eventually allowed Plaintiff to perform all her assigned job duties.

"marginal" and "unsatisfactory," that Plaintiff's accent materially interfered with Plaintiff's ability to perform her job duties.  Rather, although Plaintiff performed services for more than 1,000 clients, only two complained of Plaintiff's speech.  Plaintiff's Declaration ¶ 60.  Plaintiff also maintains that Wright regularly reprimanded Plaintiff regarding how inadequate Wright perceived Plaintiff because of Plaintiff's accent, stating it was useless to put instructions to Plaintiff in writing because Plaintiff could not understand basic English and Wright could no longer attempt to collaborate with Plaintiff.  *Id.* ¶ 95.

With regard to Plaintiff's race, Plaintiff maintains Wright commented CFS only hired Plaintiff for the Senior Case Manager position because Plaintiff is black and blacks "were worked like slaves," a statement which Plaintiff asserts Wright first made in 2005 and continued to make throughout Plaintiff's employment with CFS.  Plaintiff's Declaration ¶ 91; Plaintiff's Dep. Tr.[40] at 327.  According to Plaintiff, Wright also made comments indicating "blacks were more likely to require supervision from agencies like Child Protective Services, that Defendant did not want black employees serving rural communities, *id.* ¶ 92, that Wright referred to Plaintiff's writing ability as "monkey drafting," which Plaintiff construed as derogatory based on the color of Plaintiff's skin, *id.* ¶ 93, and that Wright stated she and others perceived Plaintiff as unreliable and dishonest because Plaintiff is black.  *Id.* ¶ 94.

This evidence, if true, is sufficient to support a reasonable jury's determination that the real reason Plaintiff's employment was terminated was because of her ethnic-based accent, race and color, and thus rebuts any presumption that Defendant's reason for terminating Plaintiff's employment was legitimate and non-discriminatory.

---

[40]  References to "Plaintiff's Dep. Tr." are to the page of the transcript of Plaintiff's deposition, filed as Plaintiff's Exh. 28.

### B.    Retaliation Claim

Plaintiff claims Defendant retaliated against her for complaining about the alleged discrimination and harassment she endured while working for CFS.  Complaint at 4.  In particular, Plaintiff alleges that after sending the January 11, 2007 e-mail to Romano, Robinson, the Senior Site Supervisor from Batavia, traveled to the Jamestown office on February 6, 2007, for a meeting with Plaintiff and Wright, at which Robinson advised Plaintiff her English posed a problem with all aspects of Plaintiff's position, and both Robinson and Wright asked Plaintiff to resign.  Complaint at 8; Plaintiff's Declaration ¶ 82.  Plaintiff alleges that when she refused to resign, "the level of derogatory treatment and false insubordination issue increased."  Complaint at 8; Plaintiff's Declaration ¶¶ 84-85, 96-97.  Plaintiff further maintains that subsequently, she learned her January 11, 2007 e-mail complaint to HR "initiated a closer scrutiny of my personal file," and details the increased "tactics and retaliation and pressuring methods" Plaintiff then experienced, including being advised the education requirements for her position had increased to require a Bachelor's degree.  Complaint at 8; Plaintiff's Declaration ¶¶ 86, 98-99.  Defendant argues in support of summary judgment on Plaintiff's retaliation claim that Plaintiff cannot establish a *prima facie* case of retaliation because there is no evidence Plaintiff engaged in protected activity or that any protected activity that Plaintiff could establish was causally connected to the termination of Plaintiff's employment.  Defendant's Memorandum at 10-11.  Defendant further maintains Plaintiff cannot establish that Defendant's legitimate, nondiscriminatory reason proffered for Plaintiff's termination, *i.e.*, Plaintiff's failure to obtain a Bachelor's degree in May 2005, was mere pretext for discrimination. *Id.* at 11-12.  In opposition to summary judgment, Plaintiff

argues her January 11, 2007 e-mail was protected activity under Title VII, Plaintiff's

Memorandum at 15-17, which was the impetus that drove Wright to push for Plaintiff's

termination.  *Id.* at 17-18.  In further support of summary judgment, Defendant maintains

the January 11, 2007 e-mail could not be considered as protected activity because it

consists solely of "perceived slights" which fail to suggest Wright's conduct was

motivated by Plaintiff's race, national origin, or any other improper factor, Defendant's

Reply at 7, and that the termination of Plaintiff's employment more than two months

later was too remote in time to support the requisite causal connection.  *Id.* at 8.

The same *McDonnell Douglas* burden shifting analysis applicable to Plaintiff's

Title VII employment discrimination claim also applies to her Title VII retaliation claim.

*Terry*, 336 F.3d at 141 (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d

Cir. 1996)).  A *prima facie* case of retaliation requires Plaintiff "demonstrate that '(1) she

engaged in protected activity; (2) the employer was aware of that activity; (3) the

employee suffered a materially adverse action; and (4) there was a causal connection

between the protected activity and the adverse action.'"  *Kelly v. Howard I. Shapiro &

Associates Consulting Engineers, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Lore v.

City of Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)).  "To prevail on a retaliation claim,

'the plaintiff need not prove that her underlying complaint of discrimination had merit,'

*Zann Kwan v. Andalex Goup LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (citing *Lore*, 670

F.3d at 157), "but only that it was motivated by a 'good faith, reasonable belief that the

underlying employment practice was unlawful.'"  *Id.* (quoting *Reed*, 95 F.3d at 1178).

Once a *prima facie* case of retaliation is established, the burden shifts to the defendant

to show a legitimate, non-discriminatory reason for the adverse employment action,

after which the burden shifts back to the plaintiff to establish such legitimate, non-discriminatory reason was mere pretext for unlawful discrimination. *Kirkland v. Cablevision Systems*, 760 F.3d 223, 225 (2d Cir. 2014).

With regard to the first element, the January 11, 2007 e-mail does contain assertions suggesting Plaintiff was complaining about disparate treatment based on her race and national origin. *See*, *e.g.*, *Williams v. Time Warner, Inc.*, 440 Fed.Appx. 7, 9-10 (2d Cir. Sept. 28, 2011) ("This Court has only required that a plaintiff provide *some* evidence of causation – even circumstantial evidence that an adverse action taken by an employer followed shortly on the heels *of a discrimination complaint* – in order to establish a *prima facie* case [of retaliation]." (italics added and citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010))). *See also Manoharan v. Columbia University College and Physicians and Surgeons*, 842 F.2d 590 593 (2d Cir. 1988) (holding in addition to establishing causality, a "plaintiff must demonstrate a good faith reasonable belief that *the underlying challenged actions of the employer violated the law*." (italics added)). Specifically, Plaintiff complains to Romano of Wright's treatment of Plaintiff, January 11, 2007 e-mail at 1-2, and attributes such treatment to Wright's animus toward Plaintiff's accent which, as discussed, Discussion, *supra*, at 41-42, can indicate racial and national origin animus. *Shao*, 2014 WL 5038389, at ** 5, 12 (evidence of disparate treatment tied to accent can indicate discrimination based on both race and national origin); *Altman*, 2007 WL 1290599, at * 4 ("[n]ational origin discrimination includes 'the denial of employment opportunity because . . . an individual has the . . . linguistic characteristics of a national group.'"); *Rivera*, 10 F.Supp.2d at 324 ("Accent and national origin are obviously inextricably intertwined in many cases.").

Further, Plaintiff's complaint is, facially, in compliance with the Child and Family Services Anti-Harassment Policy ("Anti-Harassment Policy"),[41] requiring Plaintiff to report any complaints about harassment based on, *inter alia*, race, color, and national origin to the HR Director, Anti-Harassment Policy at 2, here, Romano.  As such, a reasonable jury could find with regard to the first element of Plaintiff's retaliation claim that Plaintiff's January 11, 2007 e-mail to Romano qualifies as protected activity for purposes of a Title VII retaliation claim.

As for the second element, that the January 11, 2007 e-mail was addressed to Romano establishes Defendant was aware of the complaint.  Nor can it be disputed that Plaintiff's termination was an adverse employment action as the third element requires.  Moreover, genuine issues of fact exist as to whether Plaintiff's termination of employment was causally related to her engaging in protected activity by sending the January 11, 2007 e-mail to Romano.

As discussed in connection with Plaintiff's disparate treatment claim, Discussion, *supra*, at 36-43, there exist genuine issues of material fact as to whether Defendant has articulated a legitimate, nondiscriminatory reason for discharging Plaintiff from her Senior Case Manager position, as well as whether Plaintiff's has submitted sufficient evidence to rebut such reason.  The same evidence submitted by Plaintiff, if accepted as true by a reasonable jury, would show "'that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Kirkland*, 760 F.3d at 225 (quoting *Kwan v. Andalex Group, LLC*, 737 F.3d 834, 835 (2d Cir. 2013)).  Thus, for the same reasons as discussed in connection with Plaintiff's disparate treatment claim, the legitimate, non-discriminatory and non-retaliatory reason

---

[41] Romano Dec. Exh. C.

Defendant attempts to articulate in support of summary judgment also fail in connection

with Plaintiff's retaliation claim.

Accordingly, there is evidence in the record from which a reasonable trier of fact

could find Plaintiff's termination was causally related to Plaintiff's January 11, 2007 e-

mail to Romano complaining about Wright's treatment of Plaintiff, such that summary

judgment on Plaintiff's retaliation claim should be DENIED.

### C.    Hostile Work Environment Claim

Plaintiff alleges she was subjected to a hostile work environment as soon as she

commenced working as a Senior Project Manager for CFS in February 2005, until she

was discharged in March 2007, and attributes most of the alleged harassment to

Wright's intolerance of Plaintiff's race, color and national origin, as manifested by

Plaintiff's accent.  Complaint at 6-8.  Defendant maintains such allegations are not

sufficiently severe or pervasive to establish a hostile work environment, Defendant's

Memorandum at 15-17, were not administratively exhausted, *id.* at 13-15; and any

alleged hostile work environment that Plaintiff could establish cannot be imputed to

CFS.  *Id.* at 17-21.  In opposition to summary judgment Plaintiff argues the alleged

harassment was sufficiently severe and pervasive to support a hostile work environment

claim which is reasonably related to her disparate treatment claim so as not to require

exhaustion of administrative remedies, Plaintiff's Memorandum at 18-22; and there is

sufficient evidence in the record to impute the hostile work environment to Defendant.

*Id.* at 22-25.  In further support of summary judgment, Defendant maintains Plaintiff's

hostile work environment claim was neither pleaded in the Complaint nor reasonably

related to her Administrative Charge so as to give Defendant notice of the claim,

Defendant's Reply at 8-9; the alleged harassment was neither severe nor pervasive, *id.* at 9; and any alleged hostile work environment claim cannot be imputed to Defendant. *Id.* at 9-10.

It is significant that the criteria for establishing a disparate treatment claim, which employs the *McDonnell Douglas* burden shifting analysis, are different than those for a hostile work environment claim, which does not.  *See Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (recognizing distinction between *McDonnell Douglas* burden-shifting framework and hostile work environment analysis).  *See also Nichols v. Volunteers of America, North Alabama, Inc.*, 470 Fed.Appx. 757, 766 & n. 1 (11th Cir. Apr. 18, 2012) (citing cases comparing elements of hostile work environment claim, with discrimination elements and retaliation elements under *McDonnell Douglas*). Specifically, to establish a hostile work environment claim, "'a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Rivera v. Rochester Genesee Regional Transportation Authority*, 702 F.3d 685, 693 (2d Cir. 2012) (quoting *Gorzynski*, 596 F.3d at 102 (further internal quotation omitted)).  "In considering whether a plaintiff has met this burden, courts should 'examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance." *Id.* (quoting *Hyut v. State University of New York*, 352 F.3d 733, 745 (2d Cir. 2003)).  "Moreover, the 'test has objective and subjective elements: the misconduct shown must be severe or

pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'" *Id.* (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).  "Of course, '[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through [other means], is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic,' such as race or national origin." *Id.* (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through such concrete deprivations as being fired or being denied a promotion, is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic." (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79-80 (1998)))).  As such, in opposing summary judgment on a hostile work environment claim, the plaintiff must produce evidence "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir.) (internal quotation omitted), *cert. denied*, 540 U.S. 1016 (2003).  The evidence in the record demonstrates sufficient issues of material fact precluding summary judgment on Plaintiff's hostile work environment claim.

### 1.    Failure to Exhaust

Preliminarily, Defendant argues in support of summary judgment on Plaintiff's hostile work environment claim that neither the Complaint nor the Administrative Charge raised such claim and her earlier motion filed January 24, 2011 ("Doc. No. 62), seeking

leave to file an amended complaint asserting a hostile work environment claim was denied by the undersigned as untimely.  March 21, 2011 Decision and Order (Doc. No. 84), at 2-3.  Defendant's Memorandum at 12.  Plaintiff's further motion for reconsideration filed April 7, 2011 (Doc. No. 89) was denied by the undersigned on August 4, 2011 (Doc. No. 93).  *Id.*  As such, Defendant maintains Plaintiff should not now be allowed to establish a hostile work environment by relying on "purported racial statements" by Wright not raised in the Complaint.  *Id.*  In opposition, Plaintiff argues the hostile work environment claim is reasonably related to her Administrative Charge such that the alleged conduct underlying the complaint would have fallen within the scope of the EEOC investigation of the Administrative Charge's discrimination claim.  Plaintiff's Response at 18.  In further support of summary judgment, Defendant argues Plaintiff's Administrative Charge failed to put Defendant on notice of her hostile work environment claim.  Defendant's Reply at 8-9.

Prior to filing a Title VII claim in federal court, a plaintiff must exhaust all available administrative remedies.  *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003).  An allegation not set forth in an administrative charge will be barred as unexhausted unless the allegation is reasonably related to the allegations in the charge.  *Williams v. New York City Housing Authority*, 458 F.3d 67, 70 (2d Cir. 2006).   A claim is considered reasonably related if "'the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'"  *Mathirampuzha v. Potter*, 548 F.3d 70, 76 (2d Cir. 1008) (quoting *Deravin*, 335 F.3d at 200-01).  "'The central question is whether the complaint filed with the EEO gave the agency adequate notice to investigate discrimination on both bases."  *Id.* at 76.

"This exception to the exhaustion requirement 'is essentially an allowance of loose pleading' and is based on the recognition that 'EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose it to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering.'" *Id.*, 335 F.3d at 201 (brackets in original and quoting *Butts v. City of N.Y. Department of Housing Preservation and Development*, 990 F.2d 1397, 1402 (2d Cir. 1993), *superseded by statute on other grounds as stated in Hawkins v. 1115 Legal Service Care*, 163 F.3d 684 (2d Cir. 1998)).  Nevertheless, an administrative charge recounting nothing more than a single act of physical and verbal abuse, without reference to repeated conduct or its accumulated effect on the plaintiff fails to establish a basis on which to find a hostile work environment claim is reasonably related to a disparate treatment claim. *Mathirampuzha*, 548 F.3d at 77.

In determining whether claims are reasonably related, the focus should be 'on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.'" *Deravin*, 335 F.3d at 201 (brackets in original and quoting *Freeman v. Oakland Unified School District*, 291 F.3d 632, 637 (9th Cir. 2002)).  *See also Alonzo v. Chase Manhattan Bank, N.A.*, 25 F.Supp.2d 455, 458 (S.D.N.Y. 1998) ("[I]t is the substance of the charge and not its label that controls."). Further, although a charge of racial bias conceptually is distinct from a national origin discrimination claim, such that raising a national origin claim will not automatically suffice to alert the agency to investigate a racial discrimination claim, "race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case." *Id.*  (citing cases).

In the instant case, Plaintiff alleged in the Administrative Charge filed with the

EEOC on May 30, 2007, that she is black, of African national origin (Zaire), and speaks

with an accent.  Administrative Charge at 1.  Plaintiff also alleged wrongful termination

by Defendant for not possessing a Bachelor's degree, when none was required, and

asserted that

> During my employment I have had continuing problems with the discriminatory
> behavior of my site supervisor, Kristen Wright, who continually made comments
> that I had a communication problem and that I don't speak English.  I do speak
> English, but I have an accent.  My accent has not caused any problems in doing
> my duties.  Early in 2007, Respondent attempted to force me to resign, to follow
> my husband, who had moved to Indiana.

Administrative Charge at 2.

Because "[a]ccent and national origin are obviously inextricably intertwined in many

cases," *Rivera*, 10 F.Supp.2d at 324, and evidence of disparate treatment tied to accent

can indicate discrimination based on both race and national origin, *Shao*, 2014 WL

5038389, at ** 5, 12, Plaintiff's allegations in her Administrative Charge that she is

"black" and "of African national origin (Zaire)," and speaks with an accent, combined

with her assertions that throughout her employment at CFS Wright had problems with

her accent, although Plaintiff's accent had never interfered with Plaintiff's performance

of her job duties, were sufficient to expect the EEOC's investigation of Plaintiff's

employment discrimination claim would include an investigation of possible

discrimination against Plaintiff based on her national origin and race.

Further, despite the court's earlier denial of Plaintiff's motion to file an amended

complaint setting forth, *inter alia*, a hostile work environment claim, a plain reading of

the Complaint reveals it already asserts such claim.  In particular, Plaintiff alleges

The work place environment become [*sic*] hostile after my hiring process; initially the new Site Supervisor refused to let me occupy my new function with the assertion that my accent would be an impediment for the service delivery of the clientele in Family Court, which was more challenging than my regular public in the CDRP.  By June 2005, the Site Supervisor added my lack of a Bachelor degree as another ground to prevented [*sic*] me from taking my function in Family Court despite the fact that I tried to tell her that the Executive Director waived the educational requirement.  On or around the spring of 2005, I gave the Site Supervisor an ultimatum to send me a memo stating her position about my English and my new educational requirements or else I would take over my position in Family Court: the CRJ's Director of Operation intervened at that point and sent a [*sic*] e-mail from Buffalo to instruct the Site Supervisor to let me perform my position.

Complaint at 6-7.

Plaintiff also alleges that

Between September 2006, and January 10, 2007 the Site Supervisor used the complaint of two clients to make her case to the upper management team that my English posed a serious problem to the performance of my position and to the agency's reputation.  The Site Supervisor refused to draft comprehensive and respectable protocol to deal with cases when client [*sic*] complained about my accent or my broken English instead she used those complaints to take over my Family Court file and belittle me further.

*Id*. at 7-8.

Plaintiff further alleges that after making a complaint with CFS HR on January 11, 2007,

the entire CFS management team began asserting Plaintiff's English was the cause of

Plaintiff's communication issues with Wright, and that in February 2007, the Senior Site

Supervisor from Batavia traveled to the Jamestown office, informed Plaintiff that CFS

management had concluded Plaintiff's English was affecting her job performance, and

requested Plaintiff resign from her job.  *Id*. at 8.  Although "hostile work environment" is

not among the form complaint's list of actions for Plaintiff to designate as the basis for

her employment discrimination claims, Plaintiff did place a check mark on the line next

to "other actions" followed by a handwritten notation indicating she had experienced

degrading treatment.  Complaint at 4.  Moreover, although Plaintiff is now represented

by counsel, her Complaint was filed while Plaintiff was proceeding *pro se*, requiring the

court liberally construe its allegations.  *Haines v. Kerner*, 404 U.S. 519, 520 (1972)

(allegations of *pro se* litigant's complaint are held 'to less stringent standards than

formal pleadings drafted by lawyers.").

Accordingly, the court finds Plaintiff's hostile work environment claim was

sufficiently raised in the Administrative Charge as well as in the Complaint such that

Defendant was on notice of the claim.

### 2.      Discriminatory Intimidation in Workplace

With regard to the first criteria, "[i]n order to survive summary judgment on a

claim of hostile work environment harassment, a plaintiff must produce evidence that

'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is

sufficiently severe or pervasive to alter the conditions of the victim's employment.'"

*Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (quoting *Harris v. Forklift*

*Systems, Inc.*, 510 U.S. 17, 21 (1993) (further quotation marks and citation omitted)),

*superseded by statute on other grounds*.  "Isolated instances of harassment ordinarily

do not rise to this level."  *Id.* (citing *Kotcher v. Rosa & Sullivan Appliance Center, Inc.*,

957 F.2d 59, 62 (2d Cir. 1992)).  Whether alleged workplace harassment was

sufficiently severe or pervasive to be actionable depends on the totality of the

circumstances.  *Id.*  Here, the record contains sufficient evidence creating a triable

question as to whether Plaintiff was subjected to discriminatory intimidation in the

workplace, including whether the alleged harassment was sufficiently severe and

pervasive, and whether the Complaint gave Defendant notice of the hostile work environment claim.

Specifically, Plaintiff alleges as soon as she commenced working for CFS in February 2005, she was subjected to a hostile work environment when Wright reassigned certain of Plaintiff's Senior Case Manager job duties to herself, asserting Plaintiff's accent posed an impediment to Plaintiff's performance of her duties in Family Court and, in June 2005, resting on Plaintiff's lack of a Bachelor's degree in support of the reassignment, leading to the false assumption among CFS employees that Plaintiff was not educated.  Complaint at 6; Plaintiff's Declaration ¶¶ 57, 87.  Plaintiff also maintains that Wright made various disparaging comments directed toward Plaintiff based on her race, color, and national origin, including placing on Plaintiff's desk a sticky note on which was written "Don't mess with me, I'm a lawyer," along with a postcard depicting racial harmony, Plaintiff's Declaration ¶ 89 and Exhs. 29 and 30; creating a staff evaluation sheet for CFS clients to complete including the question "Do you understand what the mediator was saying," Plaintiff's Declaration ¶ 90, commenting throughout Plaintiff's tenure at CFS that Plaintiff was hired only because she is black and blacks "were worked like slaves," *id.* ¶ 91, and that blacks were more likely to require supervision from agencies like Child Protective Services and, therefore, Defendant did not want black employees serving rural communities, *id.* ¶ 92, comparing Plaintiff's writing ability to "monkey drafting" which Plaintiff construed as derogative of Plaintiff's skin color, *id.* ¶ 93, and never missing the opportunity to reprimand Plaintiff in the presence of others for problems that resulted from Wright's steadfast refusal to put things in writing despite Plaintiff's repeated requests.  *Id.* ¶ 96.  Plaintiff maintains

Robinson supported whatever Wright said about Plaintiff and wanted to see Plaintiff leave CFS.  *Id.* ¶ 97.  Finally, after Plaintiff made the January 11, 2007 HR Complaint expressing concern to Romano about Wright's treatment in connection with several recent incidents, Romano took no steps to resolve the conflict between Plaintiff and Wright, waiting more than 50 days before inquiring whether Plaintiff's problems with Wright had been resolved, which they were not, and Romano never invited Plaintiff to meet to discuss the complaint.  *Id* . at 17.  Plaintiff repeats and expounds on these allegations in her declaration submitted in opposition to summary judgment.

These allegations indicate the harassment directed toward Plaintiff based on her national origin and race was sufficiently continuous and concerted as to alter the conditions of Plaintiff's working environment and that senior CFS managers were award of such conditions.  *DeMars v. O'Flynn*, 287 F.Supp.2d 230, 244 (W.D.N.Y. 2003) (citing *Cruz*, 202 F.3d at 570).  *Contra Mathirampuzha*, 548 F.3d at 77 (granting summary judgment on hostile work environment claim for failure to exhaust where "[t]he plaintiff's administrative complaint contains no reference to repeated conduct or the cumulative effects of individual acts.").  Significantly, Plaintiff's assertion, Plaintiff's Declaration ¶¶ 57, 87, that soon after she commenced working as a Senior Case Manager for CFS, Wright endeavored to divest Plaintiff of her job responsibilities that involved working with Family Court ostensibly because Wright believed Plaintiff's accent interfered with such duties and that Plaintiff was not permitted to assume her Family Court job duties until after Tarbox, as CFS Director of Operations, intervened several months later strongly suggests an alteration of Plaintiff's working environment.  Similarly, Plaintiff's assertions, Plaintiff's Declaration ¶¶ 89-93, and Exhs. 29 and 30, that Wright continued to belittle

and degrade Plaintiff and sought input from others regarding problems with Plaintiff's accent is further evidence of Wright's animosity toward Plaintiff based on her national origin and race which, if true, would further negatively affect Plaintiff's work environment.  Defendant does not deny these assertions, nor has Defendant submitted any affidavit from any Family Court employee attributing any problems to Plaintiff's accent.  Under these circumstances, a reasonable trier of fact could find, based on Plaintiff's expected testimony in support, that Plaintiff was subjected to harassment that was sufficiently severe and pervasive as to render the work environment Plaintiff endured as a Senior Case Manager with CFS hostile.

### 3.    Basis for Imputing Hostile Work Environment to Defendant

Defendant, in support of summary judgment, argues that even if the alleged harassment toward Plaintiff was sufficiently severe and pervasive to establish a hostile work environment, there is no basis for imputing the hostile work environment to Defendant because Wright was Plaintiff's co-worker, rather than supervisor, as that term is defined under Title VII.  Defendant's Memorandum at 17-18.  Alternatively, Defendant, invoking the *Faragher/Ellerth* affirmation defense,[42] maintains that even if Wright is deemed Plaintiff's supervisor, Defendant is still shielded from liability because Plaintiff failed to take advantage of preventive or corrective measures offered by CFS. *Id*. at 18-21.  In opposition to summary judgment, Plaintiff argues that Wright was Plaintiff's supervisor as contemplated for imputing the alleged hostile work environment to CFS, and the *Faragher/Ellerth* affirmative defense is inapplicable because Defendant

---

[42] The *Faragher/Ellerth* defense provides for strict liability of an employer for supervisory harassment culminating in a tangible adverse employment action.  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137 (2004) (citing  *Faragher v. City of Boca Raton*, 524 U.S. 775, 765 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 808 (1998)).

was negligent and ignored the hostile work environment after receiving Plaintiff's January 11, 2007 e-mail advising of the problem.  Plaintiff's Memorandum at 22-24.  In further support of summary judgment, Defendant relies on a recent Supreme Court decision, *Vance v. Ball State University*, __ U.S. __, 133 S.Ct. 2434 (2013), as establishing Wright can only be considered Plaintiff's co-worker, rather than Plaintiff's supervisor, such that Wright was not responsible for any requisite "tangible employment action" that could be imputed to CFS.  Defendant's Reply at 9-10.  Alternatively, Defendant reiterates that even if Wright did qualify as Plaintiff's supervisor, Plaintiff's harassment claim would still fail under *Faragher/Ellerth* because there is no evidence Wright's alleged harassment of Plaintiff culminated in Plaintiff's termination given that Plaintiff's employment was terminated because Plaintiff did not possess, and lied about having obtained, the requisite Bachelor's degree for the Senior Case Manager position. *Id*. at 10.

"Beyond demonstrating a hostile work environment, a plaintiff must show a basis for imputing the objectionable conduct to the employer."  *Gorzynski*, 596 F.3d at 103 (citing *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)).  "When [ ] the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer."  *Id*. (citing *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998)).  "But even then the defending employer may be permitted, subject to proof by a preponderance of the evidence, to raise the *Faragher/Ellerth* affirmative defense to liability or damages."  *Id*.

The *Faragher/Ellerth* defense, named for two cases decided the same day, including *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), provides that "an employer is strictly liable for supervisory harassment that 'culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.'" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137 (2004) (citing *Faragher*, 524 U.S. at 765, and *Ellerth*, 524 U.S. at 808). *See also Ellerth*, 524 U.S. at 761 (identifying as tangible employment actions "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"). It is, however, significant that "[t]he *Ellerth/Faragher* framework draws a sharp line between co-workers and supervisors." *Vance*, 133 S.Ct. at 2448. Specifically, co-workers "'can inflict psychological injuries' by creating a hostile work environment, but they 'cannot dock another's pay, nor can one co-worker demote another.'" *Id.* (quoting *Ellerth*, 524 U.S. at 762). Rather, "[o]nly a supervisor has the power to cause 'direct economic harm' by taking a tangible employment action.'" *Id.* "It is because a supervisor has that authority – and its potential use hangs as a threat over the victim – that vicarious liability (subject to the affirmative defense) is justified." *Id.*

As stated here, Discussion, *supra*, at 54, Defendant maintains, Defendant's Memorandum at 17-19, that despite the "Site Supervisor" job title, Wright was not Plaintiff's supervisor as that term is defined for purposed of Title VII because Wright did not have authority to take any tangible employment action with regard to Plaintiff and, in fact, Plaintiff employment was terminated by CFS HR Director Romano, not Wright, and such termination was unrelated to any purported harassment. As such, Defendant

cannot be held strictly liable for Wright's creation of a hostile work environment as alleged by Plaintiff.  In opposing summary judgment, Plaintiff maintains that although Wright was not specifically authorized to take tangible employment action against her subordinates, including Plaintiff, Wright's Site Supervisor job description indicates Wright was delegated sufficient supervisory power as to cause a tangible employment action.  Plaintiff's Response at 23.

The Supreme Court considered the situation presently before the court in which an employee charged with the supervision of another employee's daily activities, like Wright, although not vested with authority to take any tangible employment action against her subordinates, may nevertheless be considered a supervisor for purposes of Title VII if there is evidence suggesting "the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies."  *Vance*, 133 S.Ct. at 2452 (citing *Ellerth*, 524 U.S. at 762). As such, "if the employer does attempt to confine decisionmaking power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employees."  *Id.* (citing *Rhodes v. Illinois Dept. of Transportation*, 359 F.3d 498, 509 (7th Cir. 2004) (Rovner, J., concurring in part and concurring in judgment) ("Although they did not have the power to take formal employment actions vis-à-vis [the victim], [the harassers] necessarily must have had substantial input into those decisions, as they would have been the people most familiar with her work – certainly more familiar with it than the off-site Department Administrative Services Manager.")).  Similarly, here, the record establishes a triable issue of fact

regarding how much input Wright had into the decision to terminate Plaintiff's employment.

In particular, a review of the Site Supervisor job description as found in the job posting for the position filled by Wright establishes the job's responsibilities included not only daily supervision of all staff in the offices within Chautauqua County, and regular review of case management protocols and caseloads, but also staff development through training and, importantly, conducting yearly performance evaluation for all staff reporting to Wright's Site Supervisor position.  This is consistent with the fact that on Plaintiff's 2006 and 2007 Evaluations, Wright is listed as Plaintiff's supervisor.  Significantly, on Plaintiff's 2007 Evaluation, Wright warned that "[Plaintiff] is required to present to the Human Resources Department no later than 5:00 PM on March 21, 2007 a copy of her diploma as documentation that she obtained a Bachelor Degree, as is a requirement of her position and as presented in her resumé, application and new hire documents."  2007 Evaluation at 4.  Wright also twice, after chastising Plaintiff for raising her voice to Wright, and transferring files temporarily reassigned, in Plaintiff's absence, to Wright, back to Plaintiff, warned Plaintiff that "[i]f this behavior repeats itself, action will be taken up to and including your termination." January 30, 2007 Memorandum; February 13, 2007 Memorandum.  Plaintiff referenced these two threats in her March 2, 2007 e-mail to Romano, stating she had "received two warnings of termination of employment . . . ," indicating Plaintiff understood Wright could cause Plaintiff's employment to be terminated.  March 2, 2007 e-mails.  Moreover, the statements expressed in Wright's January 11, 2007 e-mail to Robinson strongly suggest Wright had input into decisions about tangible employment actions to be taken with

regard to staff Wright supervised.  Specifically, Wright's statement that she had been

operating under the belief that Plaintiff would be voluntarily leaving her Senior Case

Manager position by the end of January 2007, Wright had "felt it best to wait this out,"

January 11, 2007 e-mail, but had recently learning Plaintiff did not plan to leave her

position until she had first acquired another position, and Wright was not sure when that

would happen, leading Wright to request an opportunity to discuss the matter with

Robinson and "Michelle,"[43] *id.*, construed with the "unsatisfactory" job performance

rating given by Wright in March 2007, 2007 Evaluation, could reasonably be construed

by a finder of fact as indicating Wright provided information to CFS personnel who held

the decision-making authority for tangible employment actions.

Defendant, however, argues that even if Wright qualifies under Title VII as

Plaintiff's supervisor, *Faragher/Ellerth* defense would still shield CFS from liability

because CFS's maintenance of an anti-harassment policy establishes CFS exercised

reasonable care to prevent and correct discriminatory behavior.  Defendant's

Memorandum at 19-21.  In opposition, Plaintiff maintains Defendant cannot establish it

has met both elements of the *Faraher/Ellerth* defense.  Plaintiff's Memorandum at 23-

25.  In further support of summary judgment, Defendant maintains Plaintiff has failed to

demonstrate compliance with Defendant's workplace harassment complaint procedures.

Defendant's Reply at 10.

The *Faragher/Ellerth* defense consists of two elements providing even if a

supervisor's behavior resulted in a tangible employment action against the plaintiff, the

employer will not be liable if (1) "the employer exercised reasonable care to prevent and

---

[43] Whether "Michelle" refers to CRJ Program Coordinator Michelle Tarbox, and what authority Tarbox has regarding personnel issues is not clear from the record.

correct promptly any [discriminatory] harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise."  *Gorzynski*, 596 F.3d at 103 (quoting *Faragher*, 524 U.S. at 807).  With regard to the first element, the maintenance of written anti-harassment policy providing a procedure for an employee who is the victim of harassment to report the harassment to the Defendant for investigation satisfies the first element.  *See Gorzynski*, 59 F.3d at 103-04 (finding employer's maintenance of formal, written anti-harassment policy providing procedure for Plaintiff to report harassment to employer for investigation satisfies first element of *Faragher/Ellerth* defense); *Ferraro v. Kellwood Co.*, 440 F.3d 96, 102 (2d Cir. 2006) ("An employer may demonstrate the exercise of reasonable care, required by the first element [of the *Faragher/Ellerth* defense], by showing the existence of an antiharassment policy during the period of the plaintiff's employment . . . .").  With regard to the second element, "proof that an employee has unreasonably failed to use the employer's complaint procedure normally suffices to satisfy the employer's burden." *Ferraro*, 440 F.3d at 102 (citing *Faragher*, 524 U.S. at 807; and *Ellerth*, 524 U.S. at 765).

Here, it is undisputed that Defendant maintains the Anti-Harassment Policy which is a formal, written policy prohibiting employees from engaging in any discrimination, harassment, and retaliation based on, *inter alia*, race, color, and national origin.  Anti-Harassment Policy at 1.  The Anti-Harassment Policy provides a choice of an informal or formal procedure for employees to complain about prohibited harassing conduct. Anti-Harassment Policy at 2.  An employee may make an informal complaint by

reporting the alleged harassment to the HR Director who is to talk to the alleged

harasser on behalf of the employee or arrange for a meeting or mediation between the

reporting employer and the alleged harasser with the assistance of the HR Director, the

HR Director's designee, or a Complaint Officer.  *Id.*  The HR Director, designee, or

Complaint Officer may, however, decide to take action to address the harassment

beyond an informal discussion.  *Id.*  The formal procedure requires the HR Director,

designee, or Complaint Officer to "interview[ ]the reporting employee, any witnesses

with knowledge of the complaint or persons who may have related information, and the

alleged harasser."  *Id.*  Upon receipt of a complaint of harassment, the HR Director or

designee is to immediately investigate the charges, recording and documenting all

information received during the investigation, following which "immediate and corrective

action will be taken, up to and including termination of the offender's employment in

accordance with legal guidelines."  *Id.*  "The defendant bears the ultimate burden of

persuasion on this element, but it may carry that burden by first introducing evidence

that the plaintiff failed to avail herself of the defendant's complaint procedure and then

relying on the absence or inadequacy of the plaintiff's justification for the failure."

*Ferraro*, 440 F.3d at 103 (citing *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246 (2d Cir.

2001)).  Although Defendant's provision of the Anti-Harassment Policy satisfies the first

*Faragher/Ellerth* defense element, Defendant has not established that Plaintiff failed to

meet her burden as to the second element because the record indicates Plaintiff did

complain about the alleged hostile work environment based on Wright's alleged race

and national-origin harassment.

Specifically, contrary to Defendant's assertion that Plaintiff did not avail herself of CFS's Anti-Harassment Policy to report the hostile work environment to which Plaintiff maintains she was subjected by Wright, Defendant's Memorandum at 20-21, a plain reading of Plaintiff's January 11, 2007 e-mail to Romano establishes Plaintiff did complain of numerous problems with Wright, including incidents with supply orders and transferring cases that were temporarily assigned to Wright during Plaintiff's vacation, back to Plaintiff upon her return.  January 11, 2007 e-mail at 1-2.  Significantly, Plaintiff attributes her issues with Wright to Wright's perception that Plaintiff's accent interfered with Plaintiff's performance of her job duties, specifying that Plaintiff was

> evolving in another culture and most of the time I need her [Wright] to translate not only literally but figuratively.  That is a handicap that is why there are laws to protect people like me.  [*sic*]  I have never experience what I am experiencing with [Wright].
>     This is [Wright's] first time working with people from another culture, but she is not the first supervisor I have [*sic*] in my life but she is the first one I have constant issues."

*Id*. at 3.

Plaintiff continued to complain to Romano of being subjected to "belittling comments" from Wright regarding Plaintiff's "lack of professionalism."  *Id*. at 2-3.  The record thus establishes a genuine issue of fact as to whether the January 11, 2007 e-mail sufficiently advised CFS HR Director Romano that Plaintiff was complaining about Wright's creation of a hostile work environment based on Plaintiff's race, color, and national origin sufficient to satisfy Plaintiff's burden under the *Faragher/Ellerth* defense.

Furthermore, the Anti-Harassment Policy requires Romano, upon receiving a complaint of harassment from an employee, to investigate the complaint and arrange for a meeting between the complaining employee and the harassing employee.  Anti-

Harassment Policy at 2.  The record, however, is devoid of any indication any such meeting was held, which is consistent with Plaintiff's assertion, Plaintiff's Declaration ¶ 98, that the requisite meeting was not held.  As such, Defendant has failed to establish the second element of the *Faragher/Ellerth* defense requiring that the complaining employee failed to avail herself of the anti-harassment procedures established by the employer.

Accordingly, Defendant has failed to establish the absence of any triable issue of fact demonstrating Plaintiff failed to avail herself of the complaint procedure provided by the Anti-Harassment Policy to warrant summary judgment based on Defendant's *Faragher/Ellerth* defense.

**D.      New York Human Rights Law Claim**

Defendant argues in support of summary judgment on Plaintiff's New York Human Rights Law claim that the relevant law permits Plaintiff to either pursue a remedy through an administrative claim to the State Department of Human Rights, or through litigation in state or federal court alleging violations of New York's Human Rights Law, but she may not do both.  Defendant's Memorandum at 21 (citing N.Y. Exec. Law § 297(9) (McKinney's 2013)).  As such, Plaintiff, by electing to pursue a remedy through the Administrative Charge to the State Department of Human Rights, is now barred from filing an action in this court under the same law, and may only challenge the DHR's determination by filing a state court petition.  *Id.* at 21-22 (citing N.Y. Exec. Law § 298 (McKinney's 2013)).   Although Plaintiff has opposed most of Defendant's Motion seeking summary judgment, Plaintiff has conceded to the dismissal

of her state HRL claim.  Plaintiff's Response at 25 n. 2.  Accordingly, Defendant's Motion should be GRANTED as to Plaintiff's state HRL claim.

To summarize, Defendant's Motion seeking summary judgment should be DENIED as to Plaintiff's disparate treatment claim based on Plaintiff's race, color, and national origin; DENIED as to Plaintiff's retaliation claim; DENIED as to Plaintiff's hostile environment claim; and GRANTED as to Plaintiff's state law claim.

## CONCLUSION

Based on the foregoing, Defendant's Motion (Doc. No. 187) should be GRANTED in part and DENIED in part.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      October 28, 2014
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      October 28, 2014
                 Buffalo, New York