UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
ROSALIE LOLONGA-GEDEON,



                    Plaintiff,                    **DECISION AND ORDER**
           v.                                     08-cv-300-JWF

CHILD AND FAMILY SERVICES,

                    Defendant.

## Procedural History

Plaintiff Rosalie Lolonga-Gedeon (hereinafter "plaintiff" or "Ms. Lolonga-Gedeon") filed this employment discrimination lawsuit against her former employer, Child and Family Services (hereinafter "defendant" or "CFS") alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et. seq. ("Title VII") and the New York State Human Rights Law, N.Y. Exec. L. §§ 290 et. seq. ("HRL") based on race, color, and national origin, and asserting claims of disparate treatment, retaliation, and hostile work environment.[1] Docket # 1. By Decision and Order issued by Judge Wolford, plaintiff's HRL and retaliation claims were dismissed and her remaining disparate treatment and hostile work environment claims were allowed to proceed to trial.[2] Docket # 212, at 15.

---

[1] Plaintiff also alleged a gender discrimination claim. However, plaintiff later advised the Court that she was no longer pursuing the gender claim. See Docket # 212, at 1, n.1.

[2] This case had been previously assigned to the Hon. Richard J. Arcara, United States Judge, and reassigned to the Hon. Elizabeth A. Wolford on January 30, 2015. Docket # 209.

1

On June 16, 2016, the parties consented to this Court's jurisdiction for the purpose of scheduling and presiding over a jury trial. See Docket # 232. On June 30, 2016, the Court scheduled the matter for trial to commence on October 31, 2016. See Docket # 235. However, on September 15, 2016, the Court received a letter from defendant's counsel, Joshua Feinstein, Esq. (hereinafter "Mr. Feinstein"), in which he advised that the parties had "reached a settlement in principle," and were "in the process of drafting the final, written agreement." See Docket # 236.

This Decision and Order pays tribute to the fact that a settlement agreement was never filed with the Court. Instead, on October 17, 2016, plaintiff's counsel Harvey Sanders, Esq. (hereinafter "Mr. Sanders") filed a motion for substitution of counsel. Thereafter, defendant filed a cross-motion to enforce the settlement. Docket ## 238, 241. On January 12, 2017, the Court held a hearing on the motions and cross-motion. During the hearing, Mr. Sanders advised the Court that he was ethically unable to continue representing plaintiff because she had refused to comply with the terms of a settlement agreement he reached with defense counsel. Following the oral argument, Mr. Sanders filed a motion to withdraw as counsel for cause (Docket # 254), which was subsequently granted by this Court. Docket # 261. The Court also denied without prejudice defendant's cross-motion to enforce the settlement (Docket # 241) as premature. Finally, the Court

2

scheduled a fact-finding hearing to determine Mr. Sanders's authority to bind plaintiff to a settlement.[3]

The fact-finding hearing was held on January 18, 2018. See Docket # 265. Three witnesses testified at the hearing: (1) Ms. Lolonga-Gedeon, appearing pro se; (2) her former attorney Mr. Sanders; and (3) Mr. Feinstein, the attorney representing CFS during the settlement negotiations. While there were stark differences between plaintiff's and Mr. Sanders's descriptions of their interactions with each other, the negotiations giving rise to the settlement were largely undisputed and indeed corroborated by a series of emails[4] exchanged among the three witnesses. Because, as discussed below, the Court finds that Mr. Sanders had the authority to settle this litigation, the relevant facts are limited to those necessary to explain the Court's holding.[5]

## Relevant Facts

The hearing testimony confirmed that the particular settlement negotiations at issue here occurred during the summer of 2016 after this Court established a firm trial date. On July

---

[3] The need for the fact-finding hearing was set forth in my previous Decision and Order and will not be repeated here. However, in denying defendant's cross-motion to enforce a settlement, the Court specifically held that if the Court ultimately determined that Mr. Sanders had the actual or apparent authority to enter into a binding settlement agreement, defendant could again seek to enforce the settlement. Docket # 261.

[4] See Hr'g Exs. 1-9, A, C, E.

[5] After the hearing was completed, the Court set a briefing schedule to provide the parties with an opportunity to summarize their positions. On April 18, 2018, defendant filed a post-hearing brief. See Docket # 268. Although provided ample opportunity, plaintiff did not file a post-hearing submission.

3

22, 2016, Mr. Sanders sent an email to plaintiff asking her if she was willing to give him authority to propose the sum of ████████ as a settlement offer. See Hr'g Ex. 1. While it was not clear from the hearing testimony exactly how this settlement figure was arrived at, it appears that this was plaintiff's initial settlement proposal. Mr. Sanders testified that he made four additional and separate inquiries on July 27, July 28, August 3, and August 11, 2016 about whether plaintiff would give him authority to convey an offer of ████████ to settle the litigation. Jan. 18, 2018 Hr'g Tr. ("Tr."), Docket # 270, at 53-54.[6]

By email dated August 15, 2016, plaintiff responded to Mr. Sanders. After informing her lawyer about a child custody issue she was experiencing, plaintiff wrote: "yes, convey the offer." Tr. at 54. Mr. Sanders testified that he understood plaintiff's response as providing him with full authority to convey the settlement proposal to defense counsel. Tr. at 54. Thereafter, settlement discussions ensued between Mr. Sanders and Mr. Feinstein. On August 24, 2016, Mr. Sanders sent an email to plaintiff in which he informed her that it was "clear that you will be unable to retain my services for trial" and if the case

---

[6] Because the settlement agreement has not yet been found to be enforceable, the Court granted defendant's request to refrain from publicly filing certain documents regarding the alleged settlement, including disclosure of the monetary terms of the settlement. Docket # 266. The transcript of the hearing has been filed under seal, as it contains numerous references to settlement terms. Similarly, a copy of this Decision and Order with redacted monetary settlement terms will be filed publicly on the docket. The full Decision and Order will be filed under seal.

4

proceeded much further, she would have to proceed pro se. In his email, Mr. Sanders encouraged plaintiff to reduce her settlement demand:

> I cannot recommend strongly enough that you be willing to accept a settlement in the ▮▮▮▮ range. Right now, they are only at ▮▮▮▮. But Mr. Feinstein seemed pretty clear that they would be willing to come up over ▮▮▮▮ if you come down. I know it is a lot less than you want, but it is more than you would recover even if you win and winning at this point will be a challenge enough. Please let me help you resolve this case so that you can focus your efforts on these other, more important, issues in your life.

See Hr'g Ex. 2. Less than an hour after sending the email, Mr. Sanders received plaintiff's succinct response: ▮▮▮▮▮▮ Hr'g Ex. 2. Mr. Sanders testified that he understood his client's response as providing him with the authority to convey a settlement demand of ▮▮▮▮ to defendant. See Tr. at 55, 66. Mr. Sanders conveyed the revised settlement proposal to Mr. Feinstein. The settlement offer was accepted by defendant and on August 26, 2016 Mr. Sanders notified plaintiff by email that "defendants have agreed to accept your proposal to settle the lawsuit for a total payment of ▮▮▮▮." See Hr'g Ex. 3. Mr. Sanders also explained to plaintiff that defense counsel was going to draft a settlement agreement and once he had "approved the form of the settlement agreement, you will have to sign it." Id.

Mr. Sanders thereafter received the proposed settlement agreement from Mr. Feinstein and later provided the agreement to

5

plaintiff for her review and approval. According to Mr. Sanders, after plaintiff reviewed the settlement agreement, she raised two specific concerns. First, she had some "confusion" as to the allocation of the settlement funds between wages, emotional distress, and attorney fees. Tr. at 57. Second, she was concerned about whether the settlement agreement would allow her to "refer to the facts and circumstances" of the case in connection with a dispute she was having with her former spouse "relating to her family's estate matters." Tr. at 57-58. Mr. Sanders testified that he promised to address those concerns with Mr. Feinstein and, indeed, defense counsel "agreed to add some language that was satisfactory to her to address those concerns." Tr. at 58. Mr. Sanders also testified that the back-and-forth discussions he had with plaintiff regarding two specific provisions in the agreement only confirmed to him that he was negotiating on behalf of his client and had the authority to settle the case once those two concerns were addressed. Tr. at 66. Accordingly, Mr. Sanders had no objection to the suggestion Mr. Feinstein made on September 15, 2017 that the parties inform the Court that the parties "reached a settlement in principle and [are] in the process of papering it." See Hr'g Ex. 9. The same day, Mr. Feinstein sent a letter to this Court in which he advised that the parties "have now reached a settlement in principle and are in the process of

6

drafting the final, written agreement." The letter was filed on the docket. See Docket # 236.

The settlement agreement was revised and approved by Mr. Sanders as consistent with his client's directions to him. On September 20, 2016, Mr. Sanders forwarded the revised agreement to plaintiff advising her that it "incorporates the changes we discussed" and asking her to return to him the "original, signed and notarized agreement." See Hr'g Ex. 7, at 3. Plaintiff did not respond to the email and Mr. Sanders sent several follow-up emails to plaintiff inquiring about the status of the agreement. In one email dated September 22, 2016, Mr. Sanders told plaintiff: "I need the original signed agreement asap as we need to file the stipulation with the court. Moreover, the sooner we send them the signed agreement, the sooner we both get paid." Id. In another email dated October 6, 2016, Mr. Sanders wrote: "Please respond. We need to submit the paperwork to the court." Id. at 1. On October 11, 2016, Mr. Sanders finally received an email from plaintiff. Plaintiff did not respond to Mr. Sanders's request for execution of the settlement agreement, nor did she indicate any objection to its terms. Instead, she requested bank account information from Mr. Sanders. Id.

On October 17, 2016, Mr. Sanders, having not received a signed agreement from plaintiff, filed his motion for substitution of counsel. See Docket # 238. Mr. Sanders testified that at no time

7

did he ever indicate to Mr. Feinstein that he lacked the authority to enter into the settlement they had agreed upon. Tr. at 65. For his part, Mr. Feinstein testified that at all times during the settlement negotiations he had with Mr. Sanders it was his understanding that Mr. Sanders "was acting with the full authority of his client" and that he never had "any indication that Mr. Sanders did not have full authority from his client to settle the matter on behalf of Ms. Gedeon." Tr. at 118.

Plaintiff also testified at the hearing. Her description of the events leading up to the settlement was often difficult to decipher. The essence of her testimony seems to be that she was never interested in money to settle the case. As to the settlement agreement itself, plaintiff testified:

> Bottom line, he [Mr. Sanders] sent me a stipulation that was already craft[ed], without my input whatsoever, and then I say from the very first day I think, if not the first day, the next day I say I am absolutely not signing it.
>
> And then he ask me why you are not signing it, and I gave him a list of like 17 issue [sic]. I say if those are still there, I will never sign it. I don't care for the money.

Tr. at 15.

## Discussion

In its earlier Decision and Order (Docket # 261), the Court explained the need for a fact-finding hearing.

> While the decision whether to settle a case is for the client to make, "[c]ourts in this Circuit have consistently recognized that an attorney may bind his or

8

her client to a settlement agreement so long as the attorney has apparent authority." Conway v. Brooklyn Union Gas Co., 236 F. Supp. 2d 241, 247 (E.D.N.Y. 2002). "[I]f an attorney has apparent authority to settle the case, and the opposing counsel has no reason to doubt this authority, then the settlement will be upheld." Id.; see also In re Artha Mgmt., Inc., 91 F.3d 326, 329 (2d Cir. 1996) ("[B]ecause of the unique nature of the attorney-client relationship, and consistent with the public policy favoring settlements, we presume that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so."). "But, in circumstances where the former attorney and his client dispute the giving of authority, courts generally require the holding of an evidentiary hearing on the question of authorization." Gomez v. City of New York, 805 F.3d 419, 424 (2d Cir. 2015) (internal quotation and citation omitted). At a hearing, it is the party challenging the authority of their attorney to settle the case on the client's behalf who "bears the burden of proving that the attorney lacked the requisite authority to settle the case." Conway v. Brooklyn Union Gas Co., 236 F. Supp. 2d at 247. This burden "is not insubstantial." United States v. Int'l Bhd. of Teamsters, 986 F.2d 15, 20 (2d Cir. 1993).

Docket # 261, at 7-8.

Accordingly, as the party challenging the authority of her lawyer, plaintiff has the "not insubstantial" burden of proving Mr. Sanders lacked the authority to act on her behalf in negotiating a settlement with defendant. Based on the testimony and exhibits received in evidence at the fact-finding hearing, I conclude that plaintiff failed to meet that burden. To the contrary, I find that the proof confirms that Mr. Sanders had actual authority to settle plaintiff's claims when he informed Mr. Feinstein that plaintiff had accepted defendant's settlement offer.

9

"An attorney's actual authority may be inferred from the words or conduct of a client which the client had reason to know would be regarded by the attorney as authorization to settle." United States v. Manning, 107 F.3d 5, at *1 (2d Cir. 1997) (unpublished decision); see also Restatement (Second) of Agency § 26 (the "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account"). Here, plaintiff knew or should have known that her "words and conduct" would reasonably be regarded by Mr. Sanders as authorization to inform defendant that the proposed settlement was acceptable.

There are several evidentiary justifications for this conclusion. First are the written communications between plaintiff and Mr. Sanders. Considered as a whole, they reflect a concerted effort by Mr. Sanders to keep his client informed about the ongoing settlement negotiations. While it is evident that Mr. Sanders was advising his client as to the risks of litigation and strongly recommending that a settlement was in her best interests, it is also apparent that Mr. Sanders knew and respected that the ultimate decision as to whether a settlement offer was acceptable was plaintiff's decision and not his. Indeed, a fair reading of the email correspondence confirms that Mr. Sanders took pains not to make a settlement proposal or accept a settlement offer without

10

first getting the permission of his client. Thus, given the context of the email thread between plaintiff and Mr. Sanders, it is clear that the communications between the two of them in August 2016 reflect plaintiff authorizing Mr. Sanders to demand ▓▓▓▓ to settle the case and, when that offer was rejected, to make a reduced demand of ▓▓▓▓ to settle the litigation.

Second, plaintiff's communications with Mr. Sanders after the monetary compensation of ▓▓▓▓ was agreed to by defendant further confirm that plaintiff had given him actual authorization to negotiate a settlement on her behalf. After notifying plaintiff that their settlement proposal had been accepted, Mr. Sanders reviewed the final settlement documents with his client. Plaintiff obviously reviewed the documents with her lawyer because she sought clarification regarding several provisions of the written agreement. The email thread and the hearing testimony confirm that Mr. Sanders suggested that defendant may be willing to add language to the agreement to address her concerns and asked his client whether his proposed language would be satisfactory, to which plaintiff responded: "yes, thank you." Hr'g Ex. 4; Tr. at 59. Mr. Sanders then communicated with defense counsel and the requested changes he had discussed with plaintiff were incorporated into the final agreement. See Tr. at 57-58, 67-68. Again, the content of the emails exchanged and the subsequent actions of all parties in finalizing the settlement agreement are

11

fully consistent with the presumption "that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so." In re Artha Mgmt., Inc., 91 F.3d at 329.

Third, there was simply no corroborative evidence introduced by plaintiff to support her contention that, at the time Mr. Sanders was negotiating the settlement agreement, plaintiff did or said anything which would reasonably be regarded by Mr. Sanders as withholding his presumed authorization to settle the litigation. See Rahman v. Kaplan Cornelia, Inc., No. 12-CV-09095 (SN), 2014 WL 541851, at *9 (S.D.N.Y. Feb. 11, 2014) (court declined to credit client's testimony that attorney lacked settlement authority because, inter alia, the client's "own conduct was not consistent with someone who had consistently rejected a settlement"). Given plaintiff's pro se status at the hearing, the Court allowed her considerable latitude in explaining her position, posing questions, and introducing exhibits. Nevertheless, there was little, if any, evidence that supports a finding that Mr. Sanders, an experienced employment law attorney, lacked settlement authority. Indeed, many of the questions posed by plaintiff were on topics unrelated or tangential to the issues for which the Court convened the hearing.

Finally, I found the testimony of Mr. Sanders regarding his communications with plaintiff to be credible. There is no question

12

that as the trial date approached, Mr. Sanders gave his client stark options on how she could proceed: "You could pay the outstanding bills and have me represent you at trial; you could proceed to trial pro se; or you could settle the case." Tr. at 82. After discussing the "plusses and minuses" of each option, plaintiff informed Mr. Sanders that if the settlement amount was high enough, settlement was her preference because she did not want to go to trial pro se and she did not have sufficient funds to pay her outstanding legal fees. Tr. at 82-83. It was after this discussion that Mr. Sanders entered into serious settlement negotiations with defense counsel. Whether the settlement ultimately reached can be enforced in the absence of a signed writing is an issue reserved for another time.[7] But clearly plaintiff understood that she was giving Mr. Sanders the authority to resolve the litigation by way of a settlement. See Walker v. City of New York, 05-CV-0004(JBW)(JMA), 2006 WL 1662702, at *4 (E.D.N.Y. June 15, 2006) (credible testimony of plaintiff's former

---

[7] Whether a settlement that has not been reduced to a document signed by all sides is enforceable requires the Court to consider four factors:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a signed writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

Ciaramella v. Reader's Digest Ass'n, 131 F.3d 320, 323 (2d Cir. 1997). "No single factor is decisive, but each provides significant guidance." Id.

counsel supported finding that he had the actual authority to "orally bind plaintiff to the terms of the settlement agreement").

## Conclusion

Based on the evidence presented at the hearing, it is my determination that plaintiff has failed to meet her "not insubstantial" burden of proving that Mr. Sanders lacked the requisite authority to settle the litigation. Accordingly, defendant may now move to enforce the settlement.

SO ORDERED.

JONATHAN W. FELDMAN
UNITED STATE MAGISTRATE JUDGE

Dated:     October 11, 2019
           Rochester, New York